Tommy G. THOMPSON, Governor of the State of Wisconsin, Petitioner,

John T. BENSON, State Superintendent of Public Instruction, Necessary-Party-Respondent,

v.

Terrance L. CRANEY, Felmers Chaney, Elizabeth Burmaster, Mike Read, Ray Heinzen, Sheryl Miller, Leon Todd, Ody Fish, Patty Hankins, Benjamin Kanninen, Anne Arnesen, Jan Serak, Mona Steele, Crystal McLean, Louis Thompson, Peter Hamon, William Hallstrom and Richard Swantz, Respondents.

Supreme Court

*No. 95–2168–OA. Oral argument November 28, 1995.—Decided March 29, 1996.*

(Also reported in 546 N.W.2d 123.)

675

For the petitioner there were briefs by *Jon P. Axelrod, Joseph A. Ranney, Paul G. Kent* and *DeWitt, Ross & Stevens S.C.*, Madison and oral argument by *Jon P. Axelrod*.

For the necessary-party-respondent the cause was argued by *Laura Sutherland*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

For the respondents there was a brief by *Lester A. Pines, Lee Cullen* and *Cullen, Weston, Pines & Bach*, Madison and oral argument by *Lester A. Pines*.

Amicus curiae brief was filed by *Gordon B. Baldwin,* Madison for PRESS Supporting Constitutionality of 1995 Act 27.

Amicus curiae brief was filed by *Christopher L. Wolle,* Madison for Assembly Speaker David Prosser, Jr.

Amicus curiae brief was filed by *Steven J. Schooler, P. Scott Hassett* and *Lawton & Cates, S.C.,* Madison for The Wisconsin Association of School District Administrators, Inc. and The Wisconsin Congress of Parents and Teachers, Inc.

Amicus curiae brief was filed by *Michael J. Julka, Frank C. Sutherland* and *Lathrop & Clark,* Madison for The Wisconsin Association of School Boards, Inc.

Amicus curiae brief was filed by *Glenn M. Stoddard* and *Garvey & Associates, S.C.,* Madison for the Friends of Public Education, Inc.

ROLAND B. DAY, C.J. This is an original action to determine the constitutionality of those parts[1] of 1995 Wis. Act 27, the budget bill, which created a state

---

[1] Governor Thompson's Petition for Leave to Commence Original Action identifies the following provisions of 1995 Wis. Act 27 as relevant to this action: 48, 71, 75, 80, 90m, 97, 138, 141, 143, 150, 169, 177m, 178-187, 198, 219, 222, 567, 594, 600, 924, 1167, 1212, 1369, 1386, 1749, 1800, 1803, 1814, 1953, 1967-1976, 1981, 2528, 2575, 2622, 3301, 3304, 3305, 3313, 3314, 3320, 3340, 3441, 3664, 3794, 3845-3854, 3859-3861, 3863-3866, 3871, 3873, 3874, 3882-3884, 3886-3889, 3893-3899, 3901, 3907, 3919-3921, 3926-3930, 3933, 3934, 3949, 3950, 3952, 3954, 3955, 3958, 3968, 3979m, 3996, 4012, 4029, 4031, 4044, 4072, 4073, 4076, 4079, 4081, 4084, 4093, 4114, 4200, 6253, 6257, 6351, 7210, 7245, 7258-7263, 9145(1), 9445(1). These provisions were enjoined by order of this court pending its decision.

Education Commission, a state Department of Education (DOE), and the position of state Secretary of Education (SOE). By this act, the non-partisan elected state Superintendent of Public Instruction (SPI) is made the chair and a member of the new Education Commission. We conclude that 1995 Wis. Act 27 unconstitutionally gives the former powers of the elected state Superintendent of Public Instruction to appointed "other officers" at the state level who are not subordinate to the superintendent. We therefore hold the education provisions of 1995 Wis. Act 27 void.

On June 29, 1995, the Wisconsin Legislature enacted 1995 Wis. Act 27. Among other provisions, the act created a new state department, the Department of Education; a new Education Commission, which supervises the DOE; and a new office, the Secretary of Education. *See* 1995 Wis. Act 27, § 177m. The Secretary of Education administers the DOE and is appointed by the Governor. *Id.* The Secretary of Education serves at the pleasure of the Governor. *Id.* The Education Commission does not have the authority to remove the Secretary of Education.

Since Wisconsin achieved statehood in 1848, the administration at the state level of public education in Wisconsin has been the duty of the Superintendent of Public Instruction, who is elected in a non-partisan

We note that §§ 80, 150, 1386, 2528, 3794, 3893, 4200, 6257, and 7245 of 1995 Wis. Act 27, which are listed in the Petition for Leave to Commence Original Action, do not appear in the final version of 1995 Wis. Act 27. The appendix to Petitioner's brief to this court also includes § 3871r of 1995 Wis. Act 27, which was not listed above, among the education provisions. We will refer to the sections of 1995 Wis. Act 27 listed in the Petition for Leave to Commence Original Action, along with § 3871r, as the "education provisions."

678

statewide election pursuant to Article X, § 1 of the Wisconsin Constitution. Under 1995 Wis. Act 27, the SPI is the chair and a member of the new Education Commission. The voting members of the Education Commission, with the exception of the SPI, are appointed as follows: two members appointed by the Governor; two members appointed by the senate majority leader; two members appointed by the speaker of the assembly; one member appointed by the senate minority leader; and one member appointed by the assembly minority leader. *See* 1995 Wis. Act 27, § 177m. 1995 Wis. Act 27 gives the authority to perform many functions related to education in Wisconsin, including some of the former duties of the SPI, to the new Secretary of Education and the Education Commission. *See id.* §§ 3846-3854, 3859-3861, 3863-3866, 3871, 3873-3874, 3882-3884, 3886-3889, 3894-3899, 3901, 3907.

Respondents[2] claim that 1995 Wis. Act 27 strips the Superintendent of Public Instruction of his power, under Article X, § 1[3] of the Wisconsin Constitution, to

---

[2] This case presents the following arrangement of parties. Governor Tommy Thompson is the petitioner; current State Superintendent of Public Instruction John Benson is listed with Governor Thompson in the caption as a "necessary-party-respondent," but was allowed to file briefs opposing the Governor's position that 1995 Act 27 was constitutional; and 18 other parties are named as respondents. To reduce confusion, this opinion will refer to SPI Benson and the other respondents collectively as "Respondents"; the opinion will refer to Governor Thompson as "Petitioner."

[3] Article X, § 1 provides:

**Superintendent of public instruction.** SECTION 1. The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and

supervise education in Wisconsin. Legislative acts are presumed constitutional, and the party challenging a legislative act must prove it unconstitutional beyond a reasonable doubt. *GTE Sprint Communications Corp. v. Wisconsin Bell*, 155 Wis. 2d 184, 192, 454 N.W.2d 797 (1990). All doubts as to an act's constitutionality must be resolved in favor of upholding the act. *Id.*

This court interprets provisions of the Wisconsin Constitution de novo. *Polk County v. State Pub. Defender*, 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994). In interpreting a constitutional provision, the court turns to three sources in determining the provision's meaning: the plain meaning of the words in the context used; the constitutional debates and the practices in existence at the time of the writing of the constitution; and the earliest interpretation of the provision by the legislature as manifested in the first law passed following adoption. *Id.*; *State v. Beno*, 116 Wis. 2d 122, 136-37, 341 N.W.2d 668 (1984).

We thus first examine the plain meaning of the language in Article X, § 1 of the Wisconsin Constitution, within the context of the document and its amendments. As first adopted in 1848, Article X, § 1 provided:

> The supervision of public instruction shall be vested in a state superintendent, and such other

their qualifications, powers, duties and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold office for 4 years from the succeeding first Monday in July. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

Wis. Const. art. X, § 1.

officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.

In 1902, Article X, § 1 was amended to read:

The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties, and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold his office for four years from the succeeding first Monday in July. The state superintendent chosen at the general election in November, 1902, shall hold and continue in his office until the first Monday in July, 1905, and his successor shall be chosen at the time of the judicial election in April, 1905. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.

Some cosmetic changes were made to Article X, § 1 by amendment in 1982. The word "his" was deleted before the word "office" in the second sentence; the word "four" was changed to "4"; and the sentence discussing the 1902 and 1905 elections for state superintendent was deleted.

Petitioner, Governor Thompson, argues that the plain meaning of Article X, § 1 allows the legislature to allocate the power of supervision of public education between the elected SPI and the "other officers" that the Article mentions. In support of this argument, Peti-

tioner points to the first sentence of Article X, § 1, which provides that "[t]he supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct"; Petitioner argues that the conjunctive "and" in this phrase must mean that the power of supervision is shared by the SPI and the "other officers." Petitioner also notes that the 1902 amendment to Article X, § 1 refers to "other officers of supervision," which, according to Petitioner, shows that "other officers" are intended to possess supervisory power along with the SPI, and not to be subordinate. Finally, Petitioner notes that the phrase "his powers, duties, and compensation" was replaced with the phrase "their qualifications, powers, duties, and compensation," which, Petitioner argues, shows that the legislature possesses the ability to establish the functions and authority of both the SPI and the "other officers."

Petitioner also claims that the 1902 amendment, which deleted the comma from the original first sentence of Article X, § 1, results in an unambiguous sentence granting the legislature the ability to determine how the power to supervise education should vest in both the SPI and the "other officers." Article X, § 1 formerly read: "The supervision of public instruction shall be vested in a state superintendent, and such other officers as the legislature shall direct." We agree with Respondents, however, that the sentence does not unambiguously convey this meaning; in fact, the sentence may have the same meaning either with or without the comma. Furthermore, the comma may have been deleted merely for stylistic reasons. We are not persuaded that this change of punctuation was intended to alter the meaning of the provision, or did result in any alteration. *See Morrill v. State*, 38 Wis.

428, 434 (1875), *rev'd on other grounds*, 154 U.S. 626 (1877) ("In giving construction to a statute the punctuation is entitled to small consideration, for that is more likely to be the work of the engrossing clerk or the printer, than the legislature."). However, Petitioner correctly observes that Article X, § 1 does use the term "other officers" and not the term "inferior officers," which appears in Article IV, § 28 of the 1848 constitution.[4]

Respondents argue that the plain meaning of "supervision" and "vested" in the context of the writing of our state constitution, supports their reading of Article X, § 1. Respondents note that Article X, § 1 is one of only four articles in the Wisconsin Constitution referring to power being "vested": in addition to Article X, § 1, Article IV, § 1 vests legislative power in the Senate and Assembly; Article V, § 1 vests executive power in the Governor; Article VII, § 2 vests judicial power in the court system. Respondents quote the definition of "superintend" and "superintendent" from *Webster's An American Dictionary of the English Language* (new rev. ed. 1847-50):

> To have or exercise the charge or oversight of; to oversee with the power of direction; to take care of with authority; as an officer superintends the building of a ship or construction of a fort. God exercises a superintending care over all his creatures.

---

[4] Wis. Const. Art. IV, § 28 provides:

Members of the legislature, and all officers, executive and judicial, except such inferior officers as may be by law exempted, shall before they enter upon the duties of their respective offices, take and subscribe an oath or affirmation to support the constitution of the United States and the constitution of the state of Wisconsin, and faithfully to discharge the duties of their respective offices to the best of their ability.

Superintendent: one who has the oversight and charge of something with the power of direction.

Respondents claim that Article X, § 1 can have meaning within these definitions only if the SPI is the sole supervisor of public education, the person "in charge"; thus, the "other officers" must be inferior, or they would interfere with the SPI's power of supervision. This court in *State ex rel. Raymer v. Cunningham*, 82 Wis. 39, 51 N.W. 1133 (1892), reached a similar conclusion regarding the language of Article X, § 1:

> [The section] expressly declares that "the supervision of public instruction shall be vested in a state superintendent, *and such other officers as the legislature shall direct*." Sec. 1, art. X. This left the legislature free to prescribe such assistants and clerks as may be deemed essential.

*Id.* at 48.

■

There remains, however, the equally plausible reading advocated by Petitioner: that, whatever "supervision" entails, the power of supervision may be allocated by the legislature between the SPI and the "other officers" because Article X, § 1 vests supervision in the SPI *and* the "other officers." We cannot conclude that the plain meaning of Article X, § 1 requires the SPI, and the SPI alone, to be the ultimate supervisor of public education in Wisconsin. The section is ambiguous, in that it can be read either as granting the power of supervision solely to the SPI, or as granting power to both the SPI and the "other officers" referred to in the section. However, under our analysis of a constitutional provision, we also examine the constitutional debates and the practices in existence at the time of the writing of the constitutional provision, and the inter-

pretation of the provision by the legislature as manifested in the laws passed following the adoption of the constitution. *Polk County*, 188 Wis. 2d at 674.

The debates at the 1846[5] and 1847-48 Wisconsin constitutional conventions show that the drafters of the Wisconsin Constitution intended the public schools to be under the supervision of the SPI, and that the SPI was to be an elected, not appointed, public official. What is now Article X, § 1, was first created in the 1846 constitution. The provision, as originally proposed, read:

> The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature may direct. The state superintendent shall be chosen by the electors of the state once in every two years. The legislature shall provide for filling vacancies in the office of state superintendent and prescribe his powers and duties.

*Journal of the Convention, reprinted in The Convention of 1846* 538 (Milo M. Quaife, ed., 1919) [hereinafter *The Convention of 1846*]. A delegate at the 1846 convention offered to amend the first sentence to read "the supervision of public education shall be vested in such

---

[5] The constitution drafted in 1846 failed to receive the approval of Wisconsin voters, thus forcing the 1847-48 convention. *See* Ray A. Brown, The Making of the Wisconsin Constitution, 1949 Wis. L. Rev. 648, 692-93. However, the voters apparently objected to portions of the 1846 constitution other than the article on education, such as the articles on banking, a homestead exemption, property rights for women, and suffrage. *Id.* at 693. The article on education drafted in 1846 was substantially adopted in the 1848 constitution. *See* Ray A. Brown, The Making of the Wisconsin Constitution—Part II, 1952 Wis. L. Rev. 23, 54-55. Thus, we will consider the debates of both 1846 and 1847-48 in our analysis.

officers as shall hereafter be created by law." *Id.* at 568. This change would have removed the office of superintendent of public instruction. The delegates of the 1846 convention, after substantial debate, retained the position of SPI, although the article on education as finally adopted stated that the SPI "shall be elected or appointed in such manner and for such term of office as the legislature shall direct." *Id.* at 743-44.

The delegates at the 1847-48 convention largely followed the wording of the earlier constitution's article on education. The original draft of the provision, while keeping the position of state Superintendent of Public Instruction, differed from the 1846 article in one important respect. Instead of an elective office, it proposed that "[t]he state superintendent shall be nominated by the governor, and by and with the advice of the senate appointed for such term of office and with such powers, duties, and compensation as shall be prescribed by law." *Journal of the Convention, reprinted in The Attainment of Statehood* 481 (Milo M. Quaife, ed., 1928) [hereinafter *The Attainment of Statehood*]. This provision was amended to make the office elective, reading "[t]he state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law." *See id.* at 559-62; Wis. Const. art. X, § 1 (1848). This amendment, and the amendment to the education article in 1846 discussed above, show that the framers of our state constitution considered and rejected the very framework proposed by 1995 Wis. Act 27. The position of Superintendent of Public Instruction was a necessary position, separate and distinct from the "other officers" mentioned in the article, as shown by the 1846 amend-

ments. The SPI was to be elected, not appointed by the Governor, as shown by the 1847-48 amendments.

We discern nothing in the 1846 and 1848 debates which supports Petitioner's contention that the SPI and the "other officers" were intended to be coequal. In fact, the recorded debates discuss only the SPI, the duties and powers of the position, and the type of person required in the office in order to further the cause of education. *See The Convention of 1846, supra,* at 568-75, 615-16; *The Attainment of Statehood, supra,* at 559-62. Completely absent is any discussion of the role or powers of the "other officers." This certainly supports Respondents' argument that the "other officers" are subordinate. If they were meant to be equal to the SPI, then it seems strange, to say the least, that their role, which would presumably have been of equal importance, was not discussed along with that of the SPI.

Nonetheless, Petitioner argues that 1995 Wis. Act 27 is still in keeping with the original intent of the framers, in that it grants the SPI the powers of an advocate for education, which Petitioner argues was the role envisioned for the SPI in 1846 and 1847-48. Examination of the debates at the two constitutional conventions, however, shows that Respondents correctly argue that the SPI was intended to have a more direct role in advancing education.

For example, the comments of a delegate opposing the amendment of 1846, which would have eliminated the position of SPI and replaced it with appointed officers, were reported as follows:

> Mr. [Wallace Wilson] Graham said, if the objection . . . is that the superintendent is made elective, he was not at all particular to the mode, but he considered that officer indispensable. There could be no uniform system without him. There must be

an annual report of the state of schools throughout the state. There could be none, said he, so satisfactory as from a man whose entire business it is to visit and know of all the schools. He considered it a matter of the greatest importance that the legislature have all this information. He mentioned Michigan, who had such a provision in her constitution.

*The Convention of 1846, supra,* at 568. Another delegate, Marshall M. Strong, noted that the SPI was needed "to travel over the state, organize the system, and awaken the people to the importance of [education.]" *Id.* The delegate John Hubbard Tweedy's remarks were reported as:

> For his part, he considered that this system of superintendence was the foundation, the life of progressive education. He believed that a constant and vigilant watch should be kept over our schools; that a state superintendent was necessary, a man of eminent learning and ability, who should devote his whole time and attention to education in our state—instituting normal schools for the education of teachers, appointing local superintendents, and visiting every county . . . .

*Id.* at 570-71. The delegate Lorenzo Bevans stated:

> All admit that the children of the state are to be instructed in political economy and in the various branches of science. How is it to be accomplished? Is it by striking the word "superintendent" from the first section of the article, by dispensing with this state officer, who alone can give uniformity, energy, and efficiency to the system?

*Id.* at 573-74. We note two consistent themes from these statements of the delegates: first, that the system of education required uniformity; second, that the SPI

was to provide this uniformity in an active manner by implementing the system of education. The statements are entirely consistent with Respondents' position.

The debates at the 1847-48 constitutional convention further support Respondents' arguments. In debating whether the office of SPI should be elective, delegate Louis P. Harvey argued for an appointed position. Harvey's description of the requirements of the position, however, shows that the SPI was not intended to be simply an advocate, but an officer with the ability to put plans into action:

> Mr. Harvey said he thought the plan recommended by the committee the best. Of late years, both in Europe and in this country, the subject of common school education had received great attention, and information on the subject was anxiously sought for. Many men of the best minds had made the subject their particular study. . . . In this way the study and practice of public instruction had come to assume somewhat the rank of a profession. We wanted a professor of that kind for superintendent—one who knows what has been done in other states and countries—what has worked well and what ill"and who has practical good sense enough to select and put in operation what has been found by experience to be the best. . . . An acquaintance with the particular subject of public instruction, with the peculiar qualities requisite for putting a system in operation with life and energy, was what was wanted.

*The Attainment of Statehood, supra*, at 560-61.

Similarly, the comments of delegate Orsamus W. Cole, speaking in favor of making the office of SPI elective, show the position's importance:

689

A superintendent . . . should have the most particular knowledge of the character, wants, and capacities of the people among whom he was to labor. He should, moreover, feel some state pride and patriotism—feel that he is not a mere hired laborer to illustrate theories, but that he is charged with an important duty in which his children, his friends, and all he holds dear are deeply interested in common. He thought a stranger could not do this as well as a citizen. Moreover, persons taken from abroad would be more apt to have different systems, different books, etc., and each one would seek to carry out his peculiar theories, and thus create confusion.

*Id.* at 562. The 1846 and 1847-48 debates demonstrate that the position of the SPI was intended as a crucial position, distinct from the "other officers," and possessing the ability to do more than merely act as an advocate for education.

As already noted, Article X, § 1 was amended in 1902. Petitioner argues that this amendment specifically allows the creation of "other officers," with powers equal to or greater than the SPI, by the legislature. Petitioner claims that, by this amendment, the drafters of the 1902 amendment created a "hybrid" system dividing power between the SPI and the "other officers."

The purpose in construing a constitutional amendment is to give effect to the intent of the framers and to the persons who adopted the amendment. *Kayden Indus., Inc. v. Murphy*, 34 Wis. 2d 718, 729, 150 N.W.2d 447 (1967) (citing *State ex rel. Ekern v. Zimmerman*, 187 Wis. 180, 184, 204 N.W. 803 (1925)).

> But the intent [of a constitutional amendment] is to be ascertained, not alone by considering the words of any part of the instrument, but by ascertaining the general purpose of the whole, in view of the evil which existed calling forth the framing and adopting of such instrument, and the remedy sought to be applied; and when the intent of the whole is ascertained, no part is to be construed so that the general purpose shall be thwarted, but the whole is to be made to conform to reason and good discretion.

*Ekern*, 187 Wis. at 184 (citation omitted).

The 1902 amendment was drafted by the then-Superintendent of Public Instruction, Lorenzo Dow Harvey. *See* Conrad Patzer, *Lorenzo Dow Harvey* 95 (1936) (unpublished manuscript, Wisconsin State Historical Society Archives). Respondents contend that one of Harvey's purposes in drafting the 1902 amendment was to change the method of selecting county school superintendents. *See id.* at 93. At the time of the amendment, Article VI, § 4[6] of the Wisconsin Constitution required county superintendents to be elected for two-year terms.[7] Harvey believed that the office of county superintendent had become a political "stepping-stone," and that the positions were being filled by persons more interested in political advancement than

---

[6] Wis. Const. art. VI, § 4 in 1902 provided in part:

**County officers; election, terms and removal of.** SECTION 4. Sheriffs, coroners, registers of deeds, district attorneys, and all other county officers except judicial officers, shall be chosen by the electors of the respective counties once in every two years.

[7] Some counties apparently did not comply with this requirement, as described in the portion of the letter from Lorenzo Dow Harvey to Albert Salisbury excerpted below. However, neither party has claimed that a possible lack of compliance would have any effect on their arguments.

in furthering the cause of education. Patzer, *supra*, at 93. Harvey thus drafted the 1902 amendment to allow the legislature to replace the elected county officials with appointed officials. Respondents argue that the phrase "other officers of supervision" in the 1902 amendment was directed at these county officials. Respondents point to several of Harvey's letters written in reference to the amendment, including one letter in which Harvey states:

> As you know in some cities the superintendents are elected by popular vote, in others by the common council, in others by the school board, and I think in some cases they are appointed by the mayor. One of the reasons for the last clause in the present amendment was to put without question this whole matter in the hands of the legislature, so that there would be no constitutional bar to prevent action by that body.

Letter from L.D. Harvey to Pres. Albert Salisbury (Oct. 16, 1902).

Petitioner, however, points to another letter of Harvey's, in which he writes:

> The last sentence, the one complained of, gives the legislature power at any time in the future, to entirely remodel the superintendency system if it sees fit to do so. For instance, if the time should come when the township system of school organization were in effect . . . this sentence of the amendment would give the legislature full power to make whatever provision might at the time be necessary.

Letter from L.D. Harvey to Karl Mathie (Oct. 15, 1902). Petitioner claims that this and other statements show that the 1902 amendment was broadly drafted with the

intent of facilitating future changes, such as the changes proposed by 1995 Wis. Act 27.

We disagree with the Petitioner's interpretation of the purpose of the 1902 amendment. The context of the 1902 amendment, along with the stated intentions of Lorenzo Dow Harvey, demonstrates that the "other officers" mentioned in the amendment are solely local officials, subordinate to the SPI. It is one thing to say that the amendment was intended to facilitate changes in the educational system by the legislature, which the amendment certainly did, but quite another thing to say that the amendment allows for the creation of officials who would replace the SPI. Another purpose of the 1902 amendment was to strengthen the position of the SPI by making the office non-partisan, *see Patzer, supra,* at 97, and thus the changes supported by Petitioner would be contrary to the general purpose of the amendment. We are to construe amendments to effect their general purpose. *Kayden,* 34 Wis. 2d at 729-30.

After our examination of the debates and history surrounding the creation of Article X, § 1 and its amendment, we are also to examine "the earliest interpretation of the provision by the legislature as manifested in the earliest law passed following the adoption of the constitution." *Polk County,* 188 Wis. 2d at 674.

An act approved on August 16, 1848, was the first law passed by the legislature setting forth the duties of the SPI. *See* Laws of 1848, at 127-29.[8] Section 3 of the act provided in part:

---

[8] Because the Laws of 1848 did not provide separate numbers for each act, we will identify each act or subsection by the pages on which it appears in the 1848 bound volume of the Laws.

693

The superintendent shall have a general supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education, and for that purpose to visit as far and as often as practicable, every town and school in the state for the purpose of inspecting the schools and diffusing as widely as possible by public addresses . . . and personal communication with school officers teachers and parents, a knowledge of existing defects and desirable improvements in the administration of the system, and the government and instruction of the schools: To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state: . . . To recommend the establishment of school libraries and to advise in the selection of books for the same: To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district: . . . to ascertain the condition of all the school funds in this state with the amount of the school funds due to each township from lands or other sources: to propose suitable forms and regulations for making all reports and conducting all necessary proceedings under this act: to adjust and decide all controversies and disputes arising under the school lands without costs to the parties: . . . to perform such other duties as the legislature or governor of this state may direct . . . .

Laws of 1848, at 128-29. Petitioner argues that this act shows that the SPI's duties in 1848 were "exhortatory," or directed towards encouraging education through, for example, public speaking or visits to schools, but not actual administration. While some such duties are listed under the act, the act also listed several duties which clearly include supervisory or administrative

694

powers. The SPI was required to apportion school funds between townships, to propose regulations for making reports and conducting proceedings under the act, and to adjudicate controversies arising under the school lands. Petitioner's claim that the SPI was limited to merely serving as an advocate for education is belied by the administrative and supervisory duties included in this first act.

This first act also gave several duties to the SPI, including the authority over school libraries, the authority to resolve disputes arising under school lands, and the authority over state funds for education, which 1995 Wis. Act 27 transfers from the SPI to the new Secretary and Department of Education. *See* 1995 Wis. Act 27, §§ 97, 180, 3926-3930 (SOE and Education Commission given authority over school district boundary appeal board and school district reorganization); *id.* §§ 4031, 4073 (granting DOE power to withhold state aid); *id.* § 1968, 1970-1973 (DOE shall plan and supervise school libraries, and Education Council shall advise SOE on library-related programs).

The first law passed relating to education did not provide for the "other officers" mentioned in the constitution. The laws relating to such officers were approved shortly afterwards, in two acts signed into law on August 21, 1848. *See* Laws of 1848, at 209-26, 226-47. The acts created the elected office of "town superintendent of common schools," whose duties included certifying teachers. *See* Laws of 1848, at 219. The acts required the creation of districts within each town, and for district officers to perform reporting and financial functions within each district. *See* Laws of 1848, at 226-35. Respondents argue that these educational officers were subordinate to the SPI, while Petitioner claims that the other officers, such as the town superin-

695

tendents of common schools, "actually operated and controlled the schools in each town." However, the Laws of 1848 clearly make the town superintendents of common schools subordinate to the state Superintendent of Public Instruction. Chapter X, § 4, of the act creating the municipal office of town superintendent of common schools provided:

> SEC. 4. The superintendant of common schools shall in all cases be under the control and direction of the state superintendant of public instruction and shall whenever called on by the state superintendant give any information in his possession relating to the several schools in his town.

Laws of 1848, at 219. The first "other officers" created by the legislature following the writing of the constitution were plainly subordinate to the state Superintendent of Public Instruction. It is clear that the "other officers" were intended by the framers of the constitution as subordinate officials, and that the power of supervision of public instruction was not vested equally in the SPI and the "other officers."

Similarly, the first law passed after the 1902 amendment to Article X, § 1 demonstrates that the amendment was not intended to give both the SPI and the "other officers" equal powers of supervision. An act adopted on March 27, 1903, titled "An Act relating to the duties, qualifications and salary of the state superintendent" included the following provisions:

> **Supervisory duties generally.** SECTION 2. [The state superintendent of public instruction] shall have general supervision over the common schools of the state . . . .

Chapter 37, § 2, Laws of 1903. This act also gave the SPI the power to "revise, codify, and edit the school laws"; to prescribe regulations for district libraries; to resolve appeals from school district decisions; and to apportion the school fund income. *Id.* Just as in the laws passed following the first constitution in 1848, this act did not provide for any "other officer" with supervisory powers superior or equal to the SPI.

Petitioner also points to previous legislative enactments which have placed the power of supervision of education in persons or bodies other than the SPI. Petitioner notes that the University of Wisconsin was not placed under exclusive control of the SPI, *see* Laws of 1848, at 37-40, and that the legislature has placed the supervision of vocational education in a Board of Industrial Education, *see* ch. 494, 583, 675, Laws of 1917. However, such legislative enactments do not conflict with the role assigned to the SPI from the very beginning of the position: "general supervision over the common schools" in Wisconsin. Wis. Stat. ch. 9, § 47 (1849). The SPI still retained general supervision over the "common schools," or public education from kindergarten through high school, after the legislative acts Petitioner discusses, and the acts thus do not support Petitioner's contention that the legislature may give the power of supervision of public education at the state level to a person or entity other than the SPI.[9]

---

[9] Respondents point to another act of the legislature which seems to undercut Petitioner's argument on this issue. 1983 Wis. Act 412 § 3(1), repealing and recreating Wis. Stat. § 118.01 (1) (1983-84), provided in part: "The constitution vests in the state superintendent the supervision of public instruction and directs the legislature to provide for the establishment of district schools." This sentence of § 118.01(1) remained unchanged until 1995 Wis. Act 27, § 3933, which would amend it to read

Both Petitioner and Respondents cite cases from other jurisdictions supporting the general theory of their respective positions. Because these cases arose under differently worded constitutions with different histories of interpretation, we do not find them particularly helpful. We conclude that the surest guides to a proper interpretation of the role of the SPI are the constitutions of 1846 and 1848, the 1902 amendment, the accompanying debates, our legislature's first laws following adoption, and this court's prior interpretation of Article X, § 1.

Our review of these sources demonstrates beyond a reasonable doubt that the office of state Superintendent of Public Instruction was intended by the framers of the constitution to be a supervisory position, and that the "other officers" mentioned in the provision were intended to be subordinate to the state Superintendent of Public Instruction. Because the education provisions of 1995 Wis. Act 27 give the former powers of the elected state Superintendent of Public Instruction to appointed "other officers" at the state level who are not subordinate to the superintendent, they are unconstitutional beyond a reasonable doubt. If changes such as those proposed in 1995 Wis. Act 27 are to be made in the structure of educational administration—and we express no judgment on the possible merits of the changes—they would require a constitutional amendment.

We note, however, that the constitutional difficulty with the education provisions of 1995 Wis. Act 27 is not that it takes power away from the office of the SPI, but rather that it gives the power of supervision of

"The constitution directs the legislature to provide for the establishment of district schools."

public education to an "other officer" instead of the SPI. As this court has previously stated, the plain language of Article X, § 1, makes the powers of the SPI and the other officers subject to limitation by legislative act:

> Article X, sec. 1, explicitly provides that the powers and duties of the school superintendent and other officers charged by the legislature with governing school systems "shall be prescribed by law." Because the constitution explicitly authorized the legislature to set the powers and duties of public instruction officers, Article X, sec. 1 confers no more authority upon those officers than that delineated by statute.

*Fortney v. School Dist. of West Salem*, 108 Wis. 2d 167, 182, 321 N.W.2d 225 (1982). Under our holding in the present case, the legislature may not give equal or superior authority to any "other officer."[10] This case

---

[10] Petitioner also argues that this court's decision in *Burton v. State Appeal Bd.*, 38 Wis. 2d 294, 156 N.W.2d 386 (1968) holds that "other officers" may hold equal power to the SPI. The issue in that case was whether members of the state appeal board, other than the SPI, were "officers" under Article X, § 1. *Burton*, 38 Wis. 2d at 298-99. This court held that the members were officers because they were "vested by the legislature with the power to exercise a portion of the sovereign power of the state and that, as the holders of such power which may be exercised by them without the control of a superior power other than the law itself, they are officers." *Id.* at 305. However, the court also noted that the "other officers" only achieved this authority within the limited setting of an appeal, and only after being appointed by the SPI:

> [W]ithin the appeal jurisdiction and the standards set by the legis-lature, the powers of the appeal board are plenary. *Once appointed*, the members of the appeal board sit as equals in their appellate jurisdiction with the Superintendent of Public Instruction, who is,

does not require us to decide the extent to which the SPI's powers may be reduced by the legislature, and we reserve judgment on that issue.

For the reasons above stated, we declare the education provisions of 1995 Wis. Act 27 void.

*By the Court.*—Rights Declared.

JON P. WILCOX, J. (*concurring*). The majority correctly concludes that 1995 Wis. Act 27 is unconstitutional, as it entrusts the former powers of the elected state Superintendent of Public Instruction (SPI) to appointed "other officers" at the state level. *See* majority op. at 678. The effect of the legislative act is to strip the SPI of his vested authority, rendering him effectively inferior to those officials appointed to the Education Commission, as overseen by the new Secretary of Education. I write separately to express my concern that the majority opinion has not given full meaning to the intent of the framers of the 1902 constitutional amendment.

I am troubled with the discussion of the context and purpose of the 1902 amendment to Article X, § 1, which provided in part:

**The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct;**

without a doubt, a public officer. *Once constituted*, they are not subordinate to any authority other than that of law . . . .

*Id.* at 301 (emphasis added). Nothing in *Burton* is contrary to our holding in the present case. While the officers on the appeal board in *Burton* could cast a vote on an appeal board along with the SPI, they were clearly still subject to the SPI's authority because they were appointed to the board by the SPI, and served only to review a single dispute. *Id.* at 302.

**and their qualifications, powers, duties, and compensation shall be prescribed by law.** The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold his office for four years from the succeeding first Monday in July . . . **The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.** (Emphasis added.)[1]

The majority relies upon a series of letters from the then-Superintendent of Public Instruction, Lorenzo Dow Harvey, to conclude that "the context of the 1902 amendment, along with the stated intentions of Lorenzo Dow Harvey, demonstrates that the 'other officers' mentioned in the amendment are solely local officials, subordinate to the SPI." Majority op. at 693.

While I recognize the concern expressed by Harvey regarding the status of county superintendents and the perceived abuse of the political office, this was but one of the reasons for the development of the amendment in 1902. The amendment cannot and should not be read to restrict itself to the limited applicability of the office of county superintendent, either in language or purpose. The majority's confined reading of the purpose of the amendment in this case undermines the prudent foresight with which Harvey viewed the maturation of the educational system in the state of Wisconsin. Upon a closer inspection of the Harvey correspondence, it is clear that he believed that the amendment reflected a comprehensive effort to increase legislative flexibility

---

[1] Cosmetic changes to Article X, § 1 effectuated by amendment in 1982 did not alter the meaning or intent of the article, and are not relevant to this discussion.

to administer future change in the educational system, as expressed by the will of the electorate, when he wrote:

> The last sentence, the one complained of, *gives the legislature power at any time in the future, to entirely remodel the superintendency system if it sees fit to do so.* For instance, if the time should come when the township system of school organization were in effect, and it were desirous to provide for township superintendents as under the laws of Massachusetts, this sentence of the amendment would give the legislature full power to make whatever provision might at the time be necessary. *The only purpose of that part of the amendment was to make it broad enough so as to fit any exigencies that might arise at any time in the future history of the state.* (Emphasis added.)

Letter from L.D. Harvey to Karl Mathie (Oct. 15, 1902). A similar sentiment is represented in another letter of Harvey's, not cited by the majority, in which he stated:

> For instance, if the township system of school government should at some time in the future be adopted in the state, and fifty years from now perhaps we should reach a state of development where like Massachusetts, we should want to adopt the township system of supervision, there would be nothing in the way in the constitution to prevent action by the legislature such as the people might desire either for the election or the appointment of these officers. *The only purpose* in the amendment beyond that of making it possible to put the election of county superintendents in the spring, *was to make the provision broad enough to meet any demand of the people at any time in the future in the organization of the school system.*

702

Letter from L.D. Harvey to C.G. Shutts (Oct. 15, 1902). (Emphasis added.) The essential nature of a representative democracy is that the will of the people as expressed by the legislature should govern. Superintendent Harvey recognized the importance of this fundamental aspect of the state's development, and demonstrated his concern that the question of remodelling the superintendency system should be firmly left to the province of the legislature.

His letters regarding the 1902 amendment consistently refer to the township system of supervision as employed in the state of Massachusetts, a discussion omitted from the majority's excerpt of the same letter. Majority op. at 692. Harvey utilized the Massachusetts educational system as a representative model which Wisconsin might wish to adopt at some point in the future. As noted by the Petitioner, this reference is significant. For in 1902, Massachusetts had a relatively weak state board of education, consisting of the governor and eight appointees. The extent of the board's powers, having changed little since its creation in 1837, consisted primarily of mere advocacy and reporting functions. Mass. L. 1837, c. 241. Rather than employing a strong SPI, the Massachusetts legislature vested control over virtually all aspects of the state school system in town school committees. Mass. L. 1898, c. 436. Such a system stood in stark contrast to the early method of supervision of public instruction implemented by the legislature in this state, in which centralized authority was placed in the hands of the SPI.

However, according to Harvey's expressed understanding of the broad nature of the 1902 amendment, a transformation of the present system may have been plausible, as the legislature was to be given full power

to meet any demand of the people in the future organization of the school system.[2]

Though recognizing Harvey's concerns regarding the county superintendents, the majority opinion has failed to give full meaning to his envisioned understanding that the legislature would be given "power at any time in the future to entirely remodel the superintendency system if it sees fit to do so." In fact, the majority has concluded that "the legislature may not give equal or superior authority to any 'other officer.' "[3] *See* majority op. at 699-700. Even though the majority alludes to the legislature's ability to make changes in the educational system, majority op. at 700, such change would certainly be restricted to local school officials on a limited jurisdictional basis, for the SPI is to

---

[2] Although the changes envisioned by Harvey may have included the movement toward the Massachusetts township system of supervision, I am mindful of the constitutional limitations placed upon the legislature. The organization of a school system which places superior authority over the supervision of public instruction in "other officers," as does 1995 Wis. Act 27, or in local officials rather than the SPI, as did Massachusetts, would exceed the acceptable boundaries of a legislative enactment, and would require a constitutional amendment.

[3] The reference to *equal* as an apparent position in the hierarchy of supervision is somewhat confusing. In light of the majority's holding, it does not appear to be possible for the legislature to create a position at the state level in which an "other officer" could share equal power with the SPI, as he or she is to be superior to any such person, according to the majority's reading of the 1902 constitutional amendment. Practically speaking, such an arrangement would require one party to have final authority over decisions regarding educational reform. The majority has decided that that power will indefinitely remain with the SPI, absent a constitutional amendment.

704

remain superior in the supervision of public instruction. *Id.*

However, this result directly conflicts with the understanding articulated by Harvey with respect to the legislature's future ability to remodel the educational system in this state. Following the reasoning of the majority, a legislative 'overhaul' of the system is acceptable, so long as the reformation does not remove the SPI from a position of superiority over any "other officer" the legislature may create. The placement of such a stifling limitation on the legislature's efforts to improve the educational system in this state is unsupported by the Harvey letters, as Harvey himself could not possibly have contemplated the effect of the majority opinion in this case.

I therefore do not agree with the majority's reasoning that the Harvey letters support the conclusion that the other officers mentioned in the amendment are to be solely local officials, subordinate to the SPI. In construing a constitutional amendment, we are to give effect to the intent of the framers and the persons who adopted the amendment. *See Kayden Indus., Inc. v. Murphy*, 34 Wis. 2d 718, 729, 150 N.W.2d 447 (1967). In order to adopt the majority's conclusion that local officials were to indefinitely remain subordinate to the SPI, one would have to read out or simply disregard the plain language of the Harvey letters. The majority has done so in this case.

Following the method for constitutional analysis established by this court in *Polk County v. State Public Defender*, 188 Wis. 2d 665, 674, 524 N.W.2d 389 (1994), we are to next examine the earliest interpretation of the provision by the legislature as manifested in the earliest law passed following the adoption of the constitution. The majority correctly identifies the first law

passed after the 1902 amendment in Chapter 37, § 2, Laws of 1903. The act reflected legislative alterations to the office of state superintendent, defining various roles and duties which were to come under the province of the SPI.

While the majority opinion is correct in stating that this specific act did not provide for any "other officer" with supervisory powers equal or superior to the SPI, the act certainly did not limit itself by express reference to maintaining the SPI as the superior officer of public instruction at the state level. There is nothing in the structure or language of the 1903 legislation nor Article X, § 1 which requires that the other officers are to indefinitely remain local officials subordinate to the SPI, absent a constitutional amendment. To the contrary, Article X, § 1 provides for the supervision of public instruction between the SPI *and* such other officers as the legislature shall direct.[4] The majority concludes that because the legislature did not prescribe specific duties to be carried on by any such "other officers" in the initial legislation following the 1902 amendment, it must have intended them to thereafter be inferior. *See* majority op. at 696-97. To do so is to

---

[4] The majority recognizes the validity of the Petitioner's interpretation of this language when it states that the section is ambiguous, in "that it can be read either as granting the power of supervision solely to the SPI, or as granting power to both the SPI and the 'other officers' referred to in the section." *See* majority op. at 684. Despite this concession, the majority concludes that the "other officers" may not be given supervisory power equal or superior to the SPI. According to the reasoning of the majority, the "other officers" may be given the power to supervise education at the local level as long as it does not usurp that of the SPI, a reading which is unsupported by the plain language of the article.

706

ignore the plain language of the 1902 amendment which provided for the election or appointment of any other officers of supervision of public instruction as fixed by law, as well as the innovative flexibility granted the legislature through this amendment, as explained by Superintendent Harvey.[5]

The ability of the legislature to create other state officers who exercise supervisory authority over public instruction was addressed by this court in *Burton v. State Appeal Bd.*, 38 Wis. 2d 294, 156 N.W.2d 386 (1968). In *Burton*, the legislature had created an appeal board to hear appeals of school district reorganization orders from agency school committees. The issue in this case was whether the members of the appeal board were "officers" under Article X, § 1. This court found that the board was legislatively created and once appointed, the board members were not subordinate to anyone, including the SPI. The court stated:

> We thus conclude that the members of the State Appeal Board have been vested by the legislature with the power to exercise a portion of sovereign power of the state and that, as holders of such power which may be exercised by them without the control of a superior power other than the law itself, they are officers.

*Burton*, 38 Wis. 2d at 305.

---

[5] As noted, Harvey stressed the importance of the adaptable nature of the 1902 amendment, an instrument for future development of the educational system in this state. It would defy logic to suggest that the legislature would be bound to a system of education currently in place, simply because it was unable to foresee a future need, and did not immediately act in furtherance following the passage of the constitutional amendment in 1902.

The majority attempts to diffuse the significance of the *Burton* decision by suggesting that the board members were subject to the SPI's authority because they were appointed to the board by the SPI, and served only to review a single appeal. Majority op. at 699-700, n. 10. While these factual distinctions may be true, the majority's narrow reading of this case misses the point. Once appointed, the members of the appeal board exercised their appellate jurisdiction at the state level as provided by the legislature, a feat which could not be duplicated under the majority's holding today. *Burton*, 38 Wis. 2d at 301. For in the present case, the majority has concluded that any legislatively-created "other officers" are to be inferior to the SPI.

The *Burton* decision should be read as this court's affirmance of the versatility of the 1902 amendment in holding that the legislature was acting in compliance with the constitution when it granted supervisory power over public instruction to "other officers" at the state level. The creation of the appeals board in *Burton* was designed to address a specific need of the populace in the organization of the school system, a concept which furthered the intent of the framers of the 1902 constitutional amendment.[6] Perhaps more significant

[6] The restructuring of the educational system in this state, as envisioned by 1995 Wis. Act 27, follows a long history of legislative effort to evaluate and improve the nature of public instruction. In 1909 the legislature appointed a committee to investigate whether the public schools and all other state educational institutions should be placed under the control of a single board or commission. *See* 1909 Jt. Res. 56; Conrad Patzer, *Public Education in Wisconsin* (1924), at 304-05. In 1915, the legislature created a State Board of Education to review the financial requirements of the public schools and other state educational institutions, and to oversee and improve the distri-

is what the court did not say. The court did not state that the plenary power of the legislature to create other officers was applicable only in limited circumstances, as suggested by the majority. Rather, the holding supports the Petitioner's contention that the "other officer" language cannot be construed to render such officials completely inferior at the state level absent a constitutional amendment.

The legislature's authority to allocate supervision of the educational system in this state was recently clarified by this court in *Fortney v. School Dist. of West Salem*, 108 Wis. 2d 167, 321 N.W.2d 225 (1982). The school board in *West Salem* had sued to vacate an arbitration award, arguing that the arbitration provision of the collective bargaining agreement at issue was unenforceable because Article X, § 1 had reserved all power over hiring and firing in the school board. *West Salem*, 108 Wis. 2d at 174-75.

This court rejected that position, holding that the powers and duties of the SPI and school boards (i.e.,

---

bution of public funds to those institutions. The work of the Board was completed in 1923. *See* L. 1915, c. 497; L. 1923, c. 179; Patzer at 222-24. The recommendation of the Commission on Improvement of the Educational System in 1949 was to channel the functions then delegated to the SPI to a central policy-making board. *See* L. 1947, c. 573; *Report of the Commission on Improvement of the Educational System* (Nov. 1948) at 16-17. Similarly, the Kellet Commission, created in 1969 by Governor Warren Knowles, recommended that a State Board of Education be created to manage all Wisconsin educational institutions. Such action by the legislature throughout the development of the educational system reflects the integral role it plays in evaluating and improving the institution of public instruction. Today's majority opinion has crippled the ability of the legislature to incorporate educational reform at the state level.

"other officers") were only those as expressly granted by the legislature, stating:

> Public instruction and its governance had no long-standing common law history at the time the Wisconsin Constitution was enacted. Furthermore, Article X, section 1, explicitly provides that **the powers and duties of the school superintendent and other officers charged by the legislature with governing school systems** "shall be prescribed by law." Because the constitution explicitly authorized the legislature to set the powers and duties of the public instruction officers, **Article X, section 1 confers no more authority upon those officers than that delineated by statute.** (Emphasis added.)

*Id.* at 182.

The legislature has consistently stated that the governance and supervision of public instruction is to be vested in a state superintendent and such other officers as they may provide. Neither the plain language of Article X, § 1, nor the 1902 constitutional amendment specifically provides that the SPI is to be the sole authority over public instruction in this state. The majority opinion, however, has come to this conclusion.[7]

This result significantly restricts the ability of the legislature to address pressing issues of educational reform. Today's holding undermines the flexibility articulated by the framers of the 1902 amendment and SPI Harvey, incorporating a rigidity into the process of

---

[7] Despite this deduction, it is somewhat ironic that the majority would, in alluding to the legislature's apparent ability to strip the SPI of his supervisory authority, specify a particular manner in which the legislature might proceed while claiming to reserve judgment. Majority op. at 700.

educational development which effectively preserves the present status of the SPI as the functional head of education in the state of Wisconsin.

In order to give significant meaning to the language in both Article X, § 1, and this court's decisions in *Burton* and *West Salem*, the 1902 constitutional amendment must be interpreted as providing the legislature with the innovative flexibility to identify and address issues involving reform. By providing for the ability to make meaningful change at the state level, the legislature is best able to effectuate the progressive will of the electorate. Moreover, allowing legislative innovation ensures that the state constitution will endure as a living document. As this court recognized in *Payne v. City of Racine*, 217 Wis. 550, 259 N.W. 437 (1935):

> A constitution usually announces certain basic principles to serve as the perpetual foundation of the state. It is not intended to be a limitation on its helpful development, nor an obstruction to its progress . . . . It has also been said that a constitution is to be interpreted by the spirit which vivifies, and not by the letter which killeth, and that a written constitution is to be interpreted by the same spirit in which it was produced.

*Id.* at 555-56. The majority opinion has overlooked the spirit which compelled the framers of the 1902 constitutional amendment, and in doing so, has impaired the ability of the legislature to improve the institution of public instruction in this state.

I am authorized to state that JUSTICE DONALD W. STEINMETZ joins this concurring opinion.