*286 ¶ 130.
SHIRLEY S. ABRAHAMSON, J.
(concurring). I join the majority opinion. It describes the salient issues raised by considering COMPAS at sentencing, and informs the bench and the bar of the limitations and cautions that should be observed in considering COMPAS in sentencing. It underscores that we are addressing the use of a research-based tool and that it is incumbent upon actors in the criminal justice system to recognize that additional research data may become available in the future and different, better tools may be developed.
¶ 131. I write separately to make two points:
¶ 132. First, I conclude that in considering COMPAS (or other risk assessment tools) in sentencing, a circuit court must set forth on the record a meaningful process of reasoning addressing the relevance, strengths, and weaknesses of the risk assessment tool.
¶ 133. Second, this court's lack of understanding of COMPAS was a significant problem in the instant case. At oral argument, the court repeatedly questioned both the State's and defendant's counsel about how COMPAS works. Few answers were available.
¶ 134. Northpointe, the company that created COMPAS, sought to file an amicus brief in the instant case to discuss the history, accuracy, and efficacy of COMPAS, as well as the use of risk assessment tools like COMPAS throughout the criminal justice system.
¶ 135. The court denied (over my dissent and without comment) Northpointe's motion to file an amicus brief. The denial was a mistake. The court needed all the help it could get. The majority opinion considers publications by Northpointe. Why could it not consider an amicus brief by Northpointe?
¶ 136. For these reasons, I write separately.
*287 I
¶ 137. I would hold that a circuit court, in considering COMPAS (or another risk assessment tool) in sentencing, must evaluate on the record the strengths, weaknesses, and relevance to the individualized sentence being rendered of the evidence-based tool (or, more precisely, the research-based or data-based tool).
¶ 138. Such an explanation is needed, I think, because the use of risk assessment tools like COMPAS has garnered mixed reviews in the scholarly literature and in popular commentary and analysis.
¶ 139. For example, although then-Attorney General Eric Holder endorsed the use of risk assessment tools in preparing and planning for the reentry of offenders into society, he cautioned against using risk assessment tools in sentencing. Attorney General Holder warned that using "static factors and immutable characteristics, like the defendant's education level, socioeconomic background or neighborhood" in sentencing could have unintended consequences, including undermining our goal of "individualized justice, with charges, convictions, and sentences befitting the conduct of each defendant and the particular crime he or she commits."[1]
*288 ¶ 140. Attorney General Holder's concerns have been echoed in other studies.[2] Additionally, studies differ regarding the accuracy of COMPAS's recidivism (and especially violent recidivism) scores.[3] The circuit court has to show its awareness of and consideration of these issues.
*289 ¶ 141. I recognize that the demands on circuit courts are many and their resources relatively few, but making a record, including a record explaining consideration of the evidence-based tools and the limitations and strengths thereof, is part of the long-standing, basic requirement that a circuit court explain its exercise of discretion at sentencing.
¶ 142. Such a process increases the likelihood that circuit courts will remain abreast of new developments in evidence-based decision making and cognizant of the qualities of the tools utilized. Such a process also provides appellate courts with a meaningful record to review and provides the State, the defendant, and the public with a transparent and comprehensible explanation for the sentencing court's decision.
II
¶ 143. With evidence-based decision making on the rise, amicus briefs evaluating the research and data will, in all likelihood, become more important. As Judge Richard Posner has written, "[m]ost judges are generalists, and increasingly we are confronted by complexities that most of us have difficulty understanding."[4] One way of addressing these complexities is taking a more expansive view toward accepting amicus briefs.
*290 ¶ 144. The court denied Northpointe's motion to file an amicus brief over my dissent. See Attachment A. COMPAS is proprietary, and Northpointe considers COMPAS's algorithms trade secrets. As a result, Northpointe does not disclose how COMPAS determines individual risk scores or it how weighs various factors in arriving at a risk score.
¶ 145. Northpointe has an obvious financial and proprietary interest in the continued use of COMPAS. The court could have taken Northpointe's interests into account in weighing Northpointe's amicus brief.
¶ 146. This court's orders accepting and rejecting amicus briefs have generally not explained the court's decision, and the orders have not been consistent. Perhaps Northpointe's brief was rejected because Northpointe had an interest in the use of its tool.
¶ 147. In contrast, in another order denying a motion to file an amicus brief (Attachment B), the amicus had no legally cognizable interest in the case.
¶ 148. Yet in Thompson v. Craney, 199 Wis. 2d 674, 546 N.W.2d 123 (1996), the court accepted an amicus brief filed by then-Assembly Speaker David T. Prosser arguing that the legislative enactment at issue in that case was constitutional.
¶ 149. In a recent case addressing similar issues to those raised in Thompson, the court permitted an amicus to file a brief and raise issues that the parties did not address. See Coyne v. Walker, No. 2013AP416, unpublished orders dated Sept. 22, 2015 and October 1, 2015.
¶ 150. Without providing an explanation for the court's acceptance or denial of amicus briefs, we provide no guidance to lawyers and other interested *291 persons wishing to file amicus briefs in future cases. The court should, in my opinion, take a more expansive view toward granting motions to file amicus briefs.
f 151. For the reasons set forth, I concur and write separately.
*292 [[Image here]]
*293 [[Image here]]
*294 [[Image here]]
*295 [[Image here]]
*296 [[Image here]]
*297 [[Image here]]
*298 [[Image here]]

 See Ryan J. Reilly, Eric Holder Warns of Risks in 'Moneyballing' Criminal Justice, Huffington Post (11:28 AM Aug. 1, 2014), http://www.huffingtonpost.com/2014/08/01/eric-holder-moneyball-criminal-justice_n_5641420.html.
Wisconsin law also recognizes the need for individualized sentences. See State v. Gallion, 2004 WI 42, ¶ 48, 270 Wis. 2d 535, 678 N.W.2d 197 (recognizing that individualized sentencing "has long been a cornerstone to Wisconsin's criminal justice jurisprudence.").
University of Wisconsin Law Professor Cecelia Klingele summarized the challenges inherent in using these tools in *288 The Promises and Perils of Evidence-Based Corrections, 91 Notre Dame L. Rev. 537, 576-78 (2015).

 See Jeff Larson et al., How We Analyzed the COMPAS Recidivism Algorithm, Pro Publica (May 23, 2016), https://www.propublica.org/article/how-we-analyzed-the-compas-recidivism-algorithm; see also Julia Angwin et al., Machine Bias, Pro Publica (May 23, 2016), https://www. propublica.org/article/machine-bias-risk-assessments-in-criminal-sentencing (reviewing the findings of Pro Publica's study and discussing numerous anecdotal examples of individuals whose risks of recidivism were incorrectly assessed).

 See, e.g., Sheldon X. Zhang et al., An Analysis of Prisoner Reentry and Parole Risk Using COMPAS and Traditional Criminal History Measures, 60 Crime & Delinquency 167,187 (2014) (finding that a model assessing just four static variables — gender, age, age of first arrest, and number of prior arrests — performed just as well as COMPAS in predicting subsequent arrests); Jennifer L. Skeem & Jennifer Eno Louden, Assessment of Evidence on the Quality of Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) 28 (2007), http://www.cdcr.ca.gov/adult _research_branch/Research_Documents/COMPAS_Skeem_ EnoLouden_Dec_2007.pdf (last visited July 1, 2016) (stating that "there is little evidence that the COMPAS predicts recidivism," and "there is no evidence that the COMPAS assesses risk state, or change over time in criminogenic needs."); but see Sharon Lansing, New York State COMPAS-Probation Risk and Need Assessment Study: Examining the Recidivism Scale's Effectiveness and Predictive Accuracy, N.Y. Div. Crim. Justice Servs., Office of Justice Research & Performance, at i (Sept. 2012) (concluding that COMPAS's "Recidivism Scale worked effectively and achieved satisfactory predictive accuracy," namely 71% accu *289 racy); Tim Brennan et al., Evaluating the Predictive Validity of the COMPAS Risk and Needs Assessment System, 36 Crim. Just. & Behavior 21, 30 (2009) (determining, in a study by three individuals for Northpointe, the company that markets COMPAS, that COMPAS's risk models are "satisfactor[il]y predictive .. . .").

 Richard A. Posner, Reflections on Judging 55 (2013).