DAVID T. PROSSER, J.
f 122. (concurring). In the spring of 2011, the legislature enacted 2011 Wisconsin Act 21, which made numerous changes in the statutes pertaining to administrative rules. Three of these changes are at issue in this case. Peggy Coyne challenged the constitutionality of the changes embodied in sections 4, 21, and 32 of Act 21 as applied to the superintendent of public instruction, and the court of appeals affirmed the circuit court's voiding of these sections as applied to the superintendent.
¶ 123. Like any justice, the author of this concurrence seeks to promote readability injudicial opinions, but in attempting to interpret the constitution and the statutes correctly, this concurring opinion will follow closely the words of the constitutional provisions and the statutes to be interpreted.
I. ACT 21
A. Section 4
¶ 124. Wisconsin Stat. § 227.135 addresses "Statements of scope of proposed rules." Subsection (1) provides that" [a]n agency shall prepare a statement of *512 the scope of any rule that it plans to promulgate." It then lists six pieces of information required in the statement of scope, including a description of the objective of the proposed rule and the statutory authority for the rule.
¶ 125. Prior to Act 21, Wis. Stat. § 227.135 (2009-10) provided in subsections (2), (3), and (4) that no state employee or official could perform any activity in connection with drafting a proposed rule until "the individual or body with policy-making power over the subject matter approved the statement of scope." The individual or body could not approve the statement of scope until the 11th day after its publication by the legislative reference bureau, which was notified of the statement immediately by the agency. Notice of the statement of scope also was sent to the secretary of administration.
¶ 126. Section 4 of Act 21 changed subsection (2) of Wis. Stat. § 227.135, in part, as follows:
An agency that has prepared a statement of the scope of the proposed rule shall present the statement to the governor and to the individual or body with policy-making powers over the subject matter of the proposed rule for approval. The agency may not send the statement to the legislative reference bureau for publication. . . until the governor issues a written notice of approval of the statement. The individual or body with policy-making powers may not approve the statement until at least 10 days after publication of the statement under sub. (3). No state employee or official may perform any activity in connection with the drafting of a proposed rule except for an activity necessary to prepare the statement of the scope of the proposed rule until the governor and the individual or body with policy-making powers over the subject matter of the proposed rule approve the statement.
*513 2011 Wis. Act 21, Section 4 (emphasis added).
¶ 127. These changes in the law vest the governor with the power to suppress publication of the scope of a proposed rule and thus prevent the individual or body with policy-making power over the subject matter of the rule from approving any statement of scope. The governor is not required to approve the proposed rule or even to act on the rule, but no state employee in the " agency" (or elsewhere in state government) may take any action to draft the proposed rule until the governor approves the statement of scope in writing.
B. Section 21
f 128. Under prior law, several entities outside state government could petition the department of administration to direct any of five enumerated departments to prepare an economic impact report for any of the department's proposed rules. Wis. Stat. § 227.137(l)-(2) (2009-10). The secretary of administration could act on his own to order an economic impact report from any of these five departments if he determined that there would be certain economic impacts from a proposed rule.
f 129. Section 9 of Act 21 now requires every "agency" to prepare an economic impact analysis for a proposed rule before submitting it to the legislative council staff under Wis. Stat. §§ 227.15, 227.137(3).
1 130. Section 21 of the Act then reads:
If an economic impact analysis regarding a proposed rule indicates that a total of $20,000,000 or more in implementation and compliance costs are reasonably expected to be incurred by or passed along to businesses, local governmental units, and individuals as a result of the proposed rule, the department of *514 administration shall review the proposed rule and issue a report. The agency may not submit a proposed rule to the legislature for review under s. 227.19(2) until the agency receives a copy of the department's report and the approval of the secretary of administration.
(Emphasis added.) See Wis. Stat. § 227.137(6).
¶ 131. Act 21 dramatically expands the number of economic impact analyses or reports, but section 21 of the Act also permits the secretary of administration, in select cases, to block a proposed rule from being submitted to the legislature for review.
C. Section 32
¶ 132. Section 32 is entirely new and reads as follows:
Approval by governor. After a proposed rule is in final draft form, the agency shall submit the proposed rule to the governor for approval. The governor, in his or her discretion, may approve or reject the proposed rule. If the governor approves a proposed rule, the governor shall provide the agency with a written notice of that approval. No proposed rule may be submitted to the legislature for review under s. 227.19(2) unless the governor has approved the proposed rule in writing.
Wis. Stat. § 227.185 (emphasis added).
f 133. The effect of sections 4, 21, and 32 and related sections of Act 21 is to give the governor legal authority to block potential administrative rules before a statement of their scope has been published and to block draft rules before they can be submitted to the legislature for review and possible approval. These changes go beyond providing the governor with addi *515 tional notice and additional information about a proposed rule. In essence, they vest the governor with a veto power over proposed rules — without imposing any standards on how that power is exercised and without indicating how the exercise of that power may be overridden by anyone.
¶ 134. This expansive power, partly shared by the secretary of administration, applies to rules promulgated by an "agency." "Agency" is defined in Wis. Stat. § 227.01(1): " 'Agency' means a board, commission, committee, department or officer in state government, except the governor, a district attorney or a military or judicial officer." The breadth of this definition means that Act 21's changes apply not only to all cabinet departments but also to the department of employee trust funds and to independent boards and commissions such as the investment board, the public service commission, and the tax appeals commission.
¶ 135. "Rule" also is broadly defined:
"Rule" means a regulation, standard, statement of policy, or general order of general application which has the effect of law and which is issued by an agency to implement, interpret, or make specific legislation enforced or administered by the agency or to govern the organization or procedure of the agency. "Rule" includes a modification of a rule under s. 227.265.
Wis. Stat. § 227.01(13). The statute then lists multiple exceptions, including a rule which " [c] oncerns the internal management of an agency and does not affect private rights or interests." § 227.01(13)(a).
¶ 136. Act 21 did not alter the legislature's established powers to review proposed rules, seek the modification of proposed rules, and, if deemed necessary, suspend proposed rules. See Wis. Stat. § 227.19; see *516 also Wis. Stat. § 227.26. However, sections 4 and 32 of Act 21 are different from Wis. Stat. § 227.19 because they do not provide specific grounds upon which the governor may choose not to approve a proposed rule. The governor is given unlimited "discretion" not to approve a proposed rule — "discretion" to do nothing about a proposed rule. By contrast, the legislature must take action if it suspends a rule.
¶ 137. This concentration of power in the governor may not raise serious legal questions when it is applied to a cabinet department already under the governor's control. However, the application of this new gubernatorial power to an independently elected constitutional officer who is not otherwise under the governor's direction is a different matter.
¶ 138. In evaluating the constitutionality of sections 4, 21, and 32 of Act 21 as applied to the superintendent of public instruction, we must remember that constitutionality should not be evaluated solely in terms of the present governor but also in terms of any future governor. It should not be evaluated solely in situations when a governor is supported by a friendly legislature but also in situations when a governor is opposed by the legislature. In other words, the legislation must be judged in light of different possible fact situations by neutral principles of law.
II. APPLICATION OF ACT 21 TO THE SUPERINTENDENT OF PUBLIC INSTRUCTION
f 139. The office of superintendent of public instruction was created by the Wisconsin Constitution in 1848. Article X, Section 1 provided:
The supervision of public instruction shall be vested in a state superintendent of public instruction, *517 and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.
Wis. Const, art. X, § 1 (1848) (emphasis added).
¶ 140. It is notable that the 1848 constitution established the office of superintendent in the same manner as it established the senate and assembly, the governor, and the judiciary:
Article IV, Section 1: "The legislative power shall be vested in a senate and assembly." (Emphasis added.)
Article V, Section 1: "The executive power shall be vested in a governor, who shall hold his office for two years; a lieutenant governor shall be elected at the same time, and for the same term." (Emphasis added.)
Article VII, Section 2: "The judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace. The legislature may also vest such jurisdiction as shall be deemed necessary in municipal courts, and shall have power to establish inferior courts in the several counties, with limited civil and criminal jurisdiction. Provided, that the jurisdiction which may be vested in municipal courts shall not exceed, in their respective municipalities, that of circuit courts, as prescribed in this constitution; and that the legislature shall provide as well for the election of judges of the municipal courts as of the judges of inferior courts, by the qualified electors of the respective jurisdictions. The term of office of the *518 judges of said municipal and inferior courts shall not be longer than that of the judges of the circuit courts.
(Emphasis added.)
¶ 141. The 1848 constitution also located the office of superintendent of public instruction in Article X, entitled "Education." There was no mention of the superintendent in Article V entitled "Executive," which discussed the governor and lieutenant governor and their respective powers. Nor was there any mention of the superintendent in Article VI entitled "Administrative," which discussed the secretary of state, treasurer, and attorney general, as well as sheriffs, coroners, registers of deeds, and district attorneys.
f 142. Because the "supervision of public instruction" is vested in the superintendent and because his position is set out in a separate article of the constitution, the superintendent appears to have a more significant status than the lieutenant governor and the officials named in Article VI.
¶ 143. At the same time, while the supervision of public instruction was vested in the state superintendent of public instruction, the constitution did not say, "The power to supervise public instruction is vested in the state superintendent of public instruction." On the contrary, the constitution specifically assigned to the legislature the authority to determine the superintendent's "powers, duties, and compensation" — as well as the "manner" of his election. The 1848 constitution also "vests" the supervision of public instruction in "such other officers as the legislature shall direct."
¶ 144. The 1848 constitution thus sent mixed signals about the status of the superintendent of public instruction.
*519 ¶ 145. Article X, Section 1 was amended in 1902 to read:
The supervision of public instruction shall be vested in a state superintendent and such other officers as the legislature shall direct; and their qualifications, powers, duties, and compensation shall be prescribed by law. The state superintendent shall be chosen by the qualified electors of the state at the same time and in the same manner as members of the supreme court, and shall hold his office for four years from the succeeding first Monday in July. The state superintendent chosen at the general election in November, 1902, shall hold and continue in his office until the first Monday in July, 1905, and his successor shall be chosen at the time of the judicial election in April, 1905. The term of office, time and manner of electing or appointing all other officers of supervision of public instruction shall be fixed by law.
Wis. Const, art. X, § 1 (1902).
¶ 146. In one way, the 1902 amendment heightened the unique position of the superintendent by moving his election from the partisan elections in November of the even-numbered years to the nonpartisan elections in the spring when supreme court justices are elected. Many of the early superintendents had been elected with a party affiliation at the same time as Wisconsin governors. The amendment removed them from a partisan ticket. In addition, the amendment gave the superintendent a four-year term many decades before the governor and other state officials in the executive branch received four-year terms.
¶ 147. On the other hand, the 1902 amendment reemphasized the role of the legislature in directing what "other officers" are vested with the supervision of public instruction and prescribing the "qualifications, *520 powers, duties, and compensation" of both the superintendent and the "other officers." The amendment added, "The term of office, time and manner of electing or appointing all other officers of supervision of public instruction [besides the superintendent] shall be fixed by law." This sentence dispensed with any notion that "other officers" were mere "assistants and clerks" to the superintendent, as was mistakenly suggested in State ex rel. Raymer v. Cunningham, 82 Wis. 39, 48, 51 N.W. 1133 (1892), ten years earlier.
f 148. This court interprets provisions of the Wisconsin Constitution de novo. Thompson v. Craney, 199 Wis. 2d 674, 680, 546 N.W.2d 123 (1996). In Dairyland Greyhound Park v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408, I restated the familiar methodology we use in constitutional interpretation:
1. Courts should give priority to the plain meaning of the words of a constitutional provision in the context used. Buse v. Smith, 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976). The plain meaning of the words is best discerned by understanding their obvious and ordinary meaning at the time the provision was adopted, taking into account other (especially contemporary) provisions of the constitution. See State ex rel. Bare v. Schinz, 194 Wis. 397, 403-04, 216 N.W. 509 (1927).
2. Courts may view the "historical analysis of the constitutional debates and of what practices were in existence in 1848 which the court may reasonably presume were also known to the framers of the 1848 constitution." Id. This principle permits courts to consider the debates surrounding amendments to the constitution and the circumstances at the time these amendments were adopted. We have said that courts may examine "the history of the times," meaning not only the legislative history of a provision (including *521 word changes in the drafts of amendments) but also "the state of society at the time," with special emphasis on the "practices and usages" then in existence, so as to identify the concerns the provision sought to address. .. .
3. Courts may scrutinize the earliest interpretations of the provision by the legislature as manifested in the first laws passed following adoption of the provision. Legislation that implements a constitutional provision is thought to be a fair gauge of contemporary interpretation and is entitled to great deference.
Id., ¶ 117 (Prosser, J., concurring in part; dissenting in part) (citation omitted).
¶ 149. In its decision in Thompson, the court focused on the second point in our methodology by emphasizing the proceedings in the 1846 and 1848 constitutional conventions, including comments by delegates about the role of the superintendent of public instruction. See Thompson, 199 Wis. 2d at 685 — 90. Three quotes from the 1846 and 1848 debates are especially pertinent:
Delegate Wallace Wilson Graham (1846) said that he "considered that officer [the superintendent] indispensable. There could be no uniform system without him. There must be an annual report of the state of schools throughout the state. There could be none, said he, so satisfactory as from a man whose entire business it is to visit and know of all the schools. He considered it a matter of the greatest importance that the legislature have all this information." Id. at 687-88 (emphasis added).
Delegate Lorenzo Bevans (1846) said: "All admit that the children of the state are to be instructed in political economy and in the various branches of sci *522 ence. How is it to be accomplished? Is it by striking the word 'superintendent' from the first section of the article, by dispensing with this state officer, who alone can give uniformity, energy, and efficiency to the system." Id. at 688 (emphasis added).
Delegate Louis P. Harvey (1848) said he wanted a superintendent who "knows what has been done in other states and countries — what has worked well and what ill and who has practical good sense enough to select and put in operation what has been found by experience to be the best.. . . An acquaintance with the particular subject of public instruction, with the peculiar qualities requisite for putting a system in operation with life and energy, was what was wanted." Id. at 689 (ellipsis in original).
f 150. These quotations clearly suggest that the framers of the constitution contemplated a superintendent of public instruction who would set standards for public schools and seek a certain uniformity among public schools throughout Wisconsin.[1] It is self-evident that standards for schools throughout Wisconsin could not be set without the power to make rules. "Uniformity" could not be sought or enforced without rules. "Putting a system in operation" could not be achieved without rules. Consequently, the very nature of the office of superintendent required the ability to make rules, irrespective of a specific grant of authority from the legislature. It is hard to believe that *523 the superintendent would have been powerless to begin to develop standards without prior legislative sanction.
¶ 151. The legislature understood this, and so it referenced "forms and regulations for making all reports and conducting all necessary proceedings under this act" in the first legislation setting forth the duties of the superintendent: *524 Laws of 1848 at 128-29, quoted in Thompson, 199 Wis. 2d at 694 (emphasis added; ellipsis in original).[2]
*523 The superintendent shall have a general supervision over public instruction in this state, and it shall be his duty to devote his whole time to the advancement of the cause of education, and for that purpose to visit as far and as often as practicable, every town and school in the state for the purpose of inspecting the schools and diffusing as widely as possible by public addresses . .. and personal communication with school officers teachers and parents, a knowledge of existing defects and desirable improvements in the administration of the system, and the government and instruction of the schools: To recommend the introduction and use of the most approved text books, and to secure as far as practicable uniformity in education throughout the state:... To recommend the establishment of school libraries and to advise in the selection of books for the same: To collect such information as may be deemed important in reference to common schools in each county, town precinct and school district:... to ascertain the condition of all the school funds in this state with the amount of the school funds due to each township from lands or other sources: to propose suitable forms and regulations for making all reports and conducting all necessary proceedings under this act: to adjust and decide all controversies and disputes arising under the school lands without costs to the parties:... to perform such other duties as the legislature or governor of this state may direct....
*524 f 152. The legislature has very broad power to make law. It can certainly authorize an "agency" to promulgate rules and it can establish procedures for doing so. It can change law so that the rules implementing former law must be changed. But a constitutional office must possess some inherent authority to proceed to fulfill its responsibilities. For example, it must have some authority to develop rules for its "internal management." See Wis. Stat. § 227.01(13)(a). For the superintendent of public instruction, the constitution provides the initial authority to develop rules because the constitution states the superintendent's mission. The constitution, of course, also gives the legislature the ultimate authority to determine what the superintendent may or may not do by prescribing the superintendent's powers and duties.
*525 ¶ 153. Over the years, the legislature has granted general authority to the superintendent to make rules. Wis. Stat. §§227.10, 227.11(2)(a). The legislature has sometimes required the superintendent to make rules. See, e.g., Wis. Stat. § 118.045. This has resulted in administrative rules on at least 40 different subjects, from "School district boundary appeals" and "School district standards" to "Commencement of school term" and "Grants for tribal language revitalization."
¶ 154. The issue in this case is whether legislation giving the governor complete authority to block a proposed rule by the superintendent of public instruction is constitutional, even when the proposed rule is authorized — perhaps required — by statute and is submitted in complete conformity with statute.
¶ 155. The answer cannot be yes, because it would give a governor authority to obstruct the work of an independent constitutional officer to such an extent that the officer would be unable to discharge the responsibilities that the legislature has given him. An absolute veto power over a proposed rule is a check without a balance. It is a power greater than the gubernatorial veto power in the constitution. Wis. Const, art V, § 10(2).
¶ 156. The power given to the governor in Act 21 provides the governor with the means not to enforce a law, even if the legislature wants it enforced, and is arguably inconsistent with the governor's obligation to take care that the laws be faithfully executed. Wis. Const, art. V, § 4.
III. THOMPSON V. CRANEY
¶ 157. The reason I have written separately and have not joined Justice Gableman's opinion is that my *526 position does not depend on the superintendent of public instruction having superiority over all other officers who are or may be vested with supervision of public instruction.
f 158. In Thompson, the court stated:
Our review of these sources demonstrates beyond a reasonable doubt that the office of state Superintendent of Public Instruction was intended by the framers of the constitution to be a supervisory position, and that the "other officers" mentioned in the provision were intended to be subordinate to the state Superintendent of Public Instruction.. . .
. . . Under our holding in the present case, the legislature may not give equal or superior authority to any "other officer."
Thompson, 199 Wis. 2d at 698-99.
¶ 159. This holding in Thompson is unwarranted for multiple reasons. It disregards the plain language of the constitution; it disregards the discussion surrounding the constitution's formation and amendment; and it disregards subsequent legislation.
¶ 160. The text of Article X, Section 1 of the 1848 constitution provided:
The supervision of public instruction shall be vested in a state superintendent of public instruction, and such other officers as the legislature shall direct. The state superintendent shall be chosen by the qualified electors of the state, in such manner as the legislature shall provide; his powers, duties, and compensation shall be prescribed by law. Provided, that his compensation shall not exceed the sum of twelve hundred dollars annually.
Wis. Const, art. X, § 1 (1848).
*527 ¶ 161. Section 1 twice mentioned "the legislature" and gave the legislature the power to prescribe the "powers" and "duties" of the superintendent and to "vest" "other officers" with "supervision of public institutions."
1 162. The framers understood the realities of local education in 1848. They did not expect the superintendent to operate local schools. "Other officers" would run the public schools in Green Bay, in Milwaukee, in Prairie du Chien, in Madison. The superintendent would not run them. The superintendent would not hire teachers in Baraboo or fire school superintendents in Beloit. In the governance and operation of local schools, the superintendent was not "superior." The superintendent would be accomplishing a lot if he were able to visit local schools, as the first statute on the superintendent charged him to do.
¶ 163. He also did not control the University of Wisconsin. The " state university, at or near the seat of government" was never under the supervision of the superintendent of public instruction. Yet it is referenced in Article X, Section 6, directly below the section mentioning the superintendent of public instruction. The creation of a public university was part of the same "Yankee Assimilation" reform movement that inspired creation of a superintendent of public instruction. Joseph A. Ranney, "Absolute Common Ground": The Four Eras of Assimilation in Wisconsin Education Law, 1998 Wis. L. Rev. 791, 792-796.
¶ 164. The superintendent played no role in the sale of "school and university lands," which is mentioned in Article X, Section 7, of the 1848 Constitution. The constitution gave the secretary of state, treasurer, and attorney general that authority.
*528 f 165. "Vested" is a potent word, but the constitution permits "other officers" to be vested with "supervision of public instruction." It should be noted that the 1848 Constitution, in Article VII, Section 2, provided that "the legislature may also vest such jurisdiction as shall be deemed necessary in municipal courts .... Provided, that the jurisdiction which may be vested in municipal courts shall not exceed . . . that of circuit courts." (Emphasis added.) There is no limitation on the powers of the "other officers" in Article X, Section 1, like the limitation on the jurisdiction of municipal courts.
f 166. The 1902 amendment benefitted the Superintendent in two respects, but it also firmed up the power of the legislature to prescribe the qualifications, powers, and duties of "other officers," thereby rebutting any notion that the elected or appointed "officers" described were mere "assistants and clerks" of the superintendent. The Thompson court conceded that Article X, Section 1 used the term "other officers," not the term "inferior officers," which appears in Article IV, Section 28 of the 1848 constitution. Thompson, 199 Wis. 2d at 683.[3] It was not too many years after the 1902 amendment was approved that the legislature created a State Board of Education consisting of the superintendent, the governor, and the secretary of state, as well as one person approved by the board of *529 regents of the University of Wisconsin and one person approved by the board of regents of the normal schools. Laws of 1915, ch. 497, § 1.
f 167. The Thompson decision acknowledged that the language of Article X, Section 1 permits a reading that the "power of supervision may be allocated by the legislature between" the superintendent and the " 'other officers' because Article X, § 1 vests supervision in the SPI and the 'other officers.' " Thompson, 199 Wis. 2d at 684. The opinion continues:
We cannot conclude that the plain meaning of Article X, § 1 requires the SPI, and the SPI alone, to be the ultimate supervisor of public education in Wisconsin. The section is ambiguous, in that it can be read either as granting the power of supervision solely to the SPI, or as granting power to both the SPI and the "other officers" referred to in the section.

Id.

¶ 168. The court then adopted the narrow reading by relying on excerpts from the early constitutional debates. In so doing, it elevated individual statements (as interpreted by the court) over explicit constitutional text. The result, in effect, was to preclude serious changes in the present system without a constitutional amendment. Id. at 698. But this rigidity is contrary not only to the text but also to the statements authored by the drafter of the 1902 amendment, Superintendent of Public Instruction Lorenzo Dow Harvey, who wrote:
The last sentence [of the amendment], the one complained of, gives the legislature power at any time in the future, to entirely remodel the superintendency system if it sees fit to do so. . .. [T]his sentence of the *530 amendment would give the legislature full power to make whatever provision might at the time be necessary.
Id. at 692 (quoting Letter from Lorenzo Dow Harvey to Karl Mathie (Oct. 15, 1902)).
¶ 169. State supervision of public instruction may be working beautifully as is, or it may need adjustment. But it can never be viewed as off limits to constructive change by the legislature. Unfortunately, the changes in Act 21 affecting the superintendent of public instruction are not constructive changes because they reallocate power without requiring accountability. Governing entails more than saying "no."
IV. CONCLUSION
f 170. In my view, the challenged sections of Act 21 are as unnecessary as they are unconstitutional. There are established methods for the governor to address undesirable or controversial administrative rules — by negotiation or, if necessary, by legislative suspension. In addition, the governor has the power to affect the superintendent's budget and to propose eliminating or transferring part of the superintendent's statutory authority.
¶ 171. All these options require the cooperation of the legislature. If the governor is unable to obtain that cooperation, he arguably should not succeed.
¶ 172. For the foregoing reasons, I respectfully concur.

 Article X, Section 3 of the 1848 constitution mirrored the uniformity theme: "The legislature shall provide by law for the establishment of district schools, which shall be as nearly uniform as practicable, and such schools shall be free and without charge for tuition to all children between the ages of four and twenty years, and no sectarian instruction shall be allowed therein." (Emphasis added.)

 The reference to "school funds" in the statute is grounded in three specific provisions in Article X of the 1848 constitution, namely, Sections 2, 4, and 5. Section 2 describes the sources of revenue for a "school fund." Sections 4 and 5 read as follows:
4. Each town and city shall be required to raise, by tax, annually for the support of common schools therein a sum not less than one-half the amount received by such town or city respectively for school purposes, from the income of the school fund.
5. Provision shall be made by law for the distribution of the income of the school fund among the several towns and cities of the state, for the support of common schools therein in some just proportion to the number of children and youth resident therein, between the ages of four and twenty years and no appropriation shall be made from the school fund to any city or town for the year in which said city or town shall fail to raise such tax, nor to any school district for the year in which a school shall not be maintained at least three months.
Wis. Const, art. X, §§ 4-5 (1848).

 Article IV, Section 28 of the 1848 Wisconsin Constitution provided:
Members of the legislature, and all officers, executive and judicial, except such inferior officers as may he by law exempted, shall before they enter upon the duties of their respective offices, take and subscribe an oath or affirmation to support the constitution of the United States and the constitution of the state of Wisconsin, and faithfully to discharge the duties of their respective offices to the best of their ability.