PAYNE, Appellant, vs. CITY OF RACINE and others, Respondents.

*February 8—March 5, 1935.*

For the appellant there was a brief by *Beck, Smith & Heft* of Racine, and oral argument by *Carroll R. Heft* and *T. M. Beck*.

For the respondents there was a brief by *Cornelius Colbert,* city attorney, and oral argument by *Mr. Colbert* and *Mr. Adolph Kanneberg* of Madison.

MARTIN, J.   There is no dispute on the facts.   In the year 1929 the city of Racine purchased real estate to be used as a site for a sewage disposal plant.   In May, 1930, the city authorized and issued general obligation bonds in the sum of $400,000 for the planning, construction, and establishment of units of a sewage disposal system.   Of the $400,000 approximately $374,000 was spent for the construction of the "Root River Interceptor" and the "Sixth Street Pumping Station;" $26,000 of this bond issue remains on hand.   In July, 1931, the city authorized the issuance of $750,000 general obligation bonds for constructing additional units of a sewage disposal system.   Only $150,000 of this issue was sold.   Part of the proceeds of this issue was used for the construction of the "Lakeshore Interceptor," a unit of the sewage disposal system, leaving a balance on hand of approximately $43,000, or a total balance on hand of $69,000 from the proceeds of the two bond issues mentioned.   On March 13, 1934, a referendum was held in the city of Racine on the question of whether or not the city should complete the sewage disposal system by a federal grant of approximately $205,000, and a loan of approximately $535,000, approved by the public works administration, and secure payment of the loan by issuing bonds in the amount of the loan payable solely out of the revenues of the sewage disposal system.   The proposal was rejected at the election.

The bonds were not to be issued under ch. 67 of the Wisconsin statutes; hence the referendum was not the referendum provided for in said chapter.   No law or ordinance required the referendum.   In the months of July and August, 1934, a loan and grant agreement between the city of Racine and the United States of America providing for the

completion of the sewage disposal system with the financial assistance of the federal emergency administration of public works was considered by the common council, approved by them, and executed on behalf of the city and the United States of America on August 30, 1934. This agreement provides that, if the city of Racine will construct an intercepting sewer and sewage treatment plant, the United States government will assist in financing the construction of the plant. The government will give a grant of thirty per cent of the cost of labor and materials expended on the project, and will purchase mortgage bonds to be issued under the provisions of sec. 66.06 (9) and sec. 66.06 (22), Stats., in a sum sufficient to cover the balance of the cost, said balance not to exceed a maximum of $598,000 unless an additional amount is approved by the government. The city of Racine in addition is to use the balance of $69,000 on hand from the sale of bonds previously issued for the construction of the system. The mortgage bonds so issued are to be secured by a pledge of the income of the sewage disposal system and the property of which the system as a whole consists.

The plaintiff contends that the term "public utility," as defined in the statutes, does not include sewage systems; that the constitutional amendment to sec. 3, art. XI, adopted in 1932, was not applicable to an extension of an existing sewage system; that ch. 133, Laws of 1933, attempted to enlarge the meaning of the term "public utility;" and, assuming that the constitutional amendment (1932) is applicable, that a municipal indebtedness is created when existing city property is mortgaged in addition to such proposed extension; further that the agreement between the city and the government which requires the expenditure of the $69,000 now on hand from the sale of bonds previously issued for the construction of the sewage system, and the mortgaging of the real estate which the city purchased in December, 1929, upon which to erect a sewage treatment

plant, creates a municipal indebtedness within the meaning of the constitutional debt limitation; also that the pledging of all income from "entire system" without segregation of the income attributable to the extension only, creates a municipal indebtedness; plaintiff further contends that the city has no authority to divert the $69,000 now on hand from the proceeds of the two former bond issues to the special purpose provided for in the agreement between the city and the government.

Does the term "public utility" in the constitutional amendment embrace a sewage disposal system such as the city of Racine proposes to construct? Prior to the 1932 amendment, sec. 3, art. XI, of the Wisconsin constitution, provided, in part, as follows:

"No county, city . . . or other municipal corporation shall be allowed to become indebted in any manner or for any purpose to any amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein, to be ascertained ·by the last assessment for state and county taxes previous to the incurring of such indebtedness. Any county, city . . . or other municipal corporation incurring any indebtedness as aforesaid, shall, before or at the time of doing so, provide for the collection of a direct annual tax sufficient to pay the interest on such debt as it falls due, and also to pay and discharge the principal thereof within twenty years from the time of contracting the same. . . ."

In 1929 and 1931 the Wisconsin legislature passed a joint resolution providing for, and in 1932 the people of the state of Wisconsin by referendum approved, the following, which thereby became an amendment to sec. 3, art. XI:

"Providing, that an indebtedness created for the purpose of purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility of a town, village or city, and secured solely by the property or income of such public utility, and whereby no municipal liability is created, shall not be

considered an indebtedness of such town, village or city, and shall not be included in arriving at such five per centum debt limitation."

The term "public utility," as used in the foregoing amendment, must be considered to include all plants or activities which the legislature can reasonably classify as public utilities in the ordinary meaning of the term. The rule of constitutional construction, where the document is submitted to the electors for adoption, is stated as follows:

"Words or terms used in a constitution, being dependent on ratification by the people, must be understood in the sense most obvious to the common understanding at the time of its adoption, although a different rule might be applied in interpreting statutes and acts of the legislature. This gives rise to the recognized rule of construction that it is presumed that words appearing in a constitution have been used according to their plain, natural and usual signification and import, and the courts are not at liberty to disregard the plain meaning of words of a constitution in order to search for some other conjectured intent." 6 R. C. L. p. 52, § 47, title "Constitutional Law;" *B. F. Sturtevant Co. v. Industrial Comm.* 186 Wis. 10, 202 N. W. 324; 1 Cooley, Const. Lim. (8th ed.) 130–132.

In 6 R. C. L. p. 46, § 40, it is stated:

"A constitution usually announces certain basic principles to serve as the perpetual foundation of the state. It is not intended to be a limitation on its helpful development, nor an obstruction to its progress. Accordingly the courts are not inclined to adopt such a technical or strained construction as will unduly impair the efficiency of the legislature to meet responsibilities occasioned by changing conditions of society, but it is proper to assume that a constitution is intended to meet and be applied to new conditions and circumstances as they may arise in the course of the progress of the community. The courts in this country have shown a determination to give our written constitutions, by interpretation, such flexibility as will bring them into accord with what the courts believe to be public interest. The terms and provisions are being constantly expanded and enlarged by con-

struction to meet the advancing and improving affairs of men. It has been authoritatively stated that as changes come in social and political life the federal constitution embraces in its grasp all new conditions which are within the scope of the powers in terms conferred. In other words, while the powers granted do not change, they apply from generation to generation to all things to which they are in their nature applicable. It has also been said that a constitution is to be interpreted by the spirit which vivifies, and not by the letter which killeth, and that a written constitution is to be interpreted by the same spirit in which it was produced."

The term "public utility," as construed by the courts, includes a sewage disposal system. *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co.* 308 Ill. 294, 139 N. E. 418; *Pinney & B. Co. v. Los Angeles Gas & E. Co.* 168 Cal. 12, 141 Pac. 620; L. R. A. 1915 C, 282, Ann. Cas. 1915 D, 471; *Clark v. Olson* (Wash.), 31 Pac. (2d) 534, 93 A. L. R. 240.

In *Cawker v. Meyer,* 147 Wis. 320, 324, 325, 133 N. W. 157, speaking of the term "public utility," this court said:

"The state claims that by furnishing heat, light, and power to the tenants of their own building the plaintiffs became a public utility; that the furnishing of such commodities to anyone else than to one's self is furnishing it to the public within the meaning of the statute. It is obvious that such a construction is too narrow, for it would constitute the owner of every building furnishing heat or light to tenants, as well as every householder who rents a heated or lighted room, a public utility. The legislature never contemplated such a construction to be given the words 'public utility.' They must receive a construction that will effectuate the evident intent of the legislature and not one that will lead to a manifest absurdity. It was not the furnishing of heat, light, or power to tenants or, incidentally, to a few neighbors that the legislature sought to regulate, but the furnishing of those commodities to the public, that is, to whoever might require the same. *Wis. River Imp. Co. v. Pier,* 137 Wis. 325, 118 N. W. 857. The use to which the plant, equipment, or some portion thereof is put must be for the public in order to con-

stitute it a public utility. But whether or not the use is for the public does not necessarily depend upon the number of consumers; for there may be only one, and yet the use be for the public—as where a plant is built and operated for furnishing power to the public generally, but for a time finds one consumer who uses it all. If the product of the plant is intended for and open to the use of all members of the public who may require it, to the extent of its capacity, the fact that only one or two thereof consume the entire product renders the plant none the less a public utility. . . ." *Schumacher v. Railroad Comm.* 185 Wis. 303, 201 N. W. 241; *Wisconsin T., L., H. & P. Co. v. Green Bay & M. C. Co.* 188 Wis. 54, 205 N. W. 551; *Ford Hydro-Electric Co. v. Aurora,* 206 Wis. 489, 240 N. W. 418.

The legislature of Wisconsin has, by several enactments since the 1932 amendment to sec. 3, art. XI, of the state constitution, specifically interpreted the amendment as embracing a sewage disposal system within the term "public utility" as contained in the constitutional amendment. This is shown by the enactment of ch. 133, Laws of 1933, which added a new subsection to sec. 66.06 of the statutes, which, in part, provides:

"(22) (a) Any town, village or city may construct, acquire or lease, extend or improve any plant and equipment within or without its corporate limits for the treatment and disposal of sewage, including the intercepting sewers necessary in connection therewith, and provide payment for the same or any part thereof from the general fund, from taxation, or from the proceeds of either municipal bonds, mortgage bonds, mortgage certificates, or as otherwise provided by law."

The same legislative intent is shown by ch. 162, Laws of 1933, which, in the title, makes specific reference to the amendment of sec. 3, art. XI, of the state constitution. The title of the act provides:

"An Act to repeal and recreate subsection (9) of section 66.06 and to create paragraph (bn) of subsection (1) of section 206.34 and paragraph (bn) of subsection (1) of

section 231.32 of the statutes, relating to the financing of municipally owned public utilities and providing machinery for carrying out the amendment to section 3 of article XI which was adopted by the people in general election of November, 1932."

We do not deem it necessary to make further reference to the specific enactments of the legislature since the 1932 amendment to the state constitution as showing the legislative intent and construction placed upon said amendment. As said by this court in *State ex rel. Pluntz v. Johnson,* 176 Wis. 107, 114, 184 N. W. 683, 186 N. W. 729:

"This amounts to contemporaneous legislative construction of this constitutional provision, which construction is entitled to great deference."

Appellant contends that the term "public utility" had a definite statutory meaning when the constitutional amendment was adopted in 1932. Therefore it follows that such constitutional amendment was adopted with intention to use the term "public utility" as such term was then defined in the Wisconsin Statutes. Sec. 196.01 (1), Stats., contains the following definition of a public utility:

"196.01 *Definitions.* (1) As used in chapters 196 and 197, unless the context requires otherwise, 'public utility' means and embraces every corporation, company, individual, association, their lessees, trustees or receivers appointed by any court, and every town, village or city that may own, operate, manage or control any toll bridge or any plant or equipment or any part of a plant or equipment, within the state, for the conveyance of telephone messages or for the production, transmission, delivery or furnishing of heat, light, water or power either directly or indirectly to or for the public."

This definition is restricted to the use of the term in chs. 196 and 197 of the statutes. Obviously it is confined to the particular classes of public utilities therein mentioned.

The reason for such restriction does not apply to the term as used in the constitutional amendment. The term "public utility," as defined in sec. 196.01 (1), Stats., means a person or corporation which operates a utility, while in the constitutional amendment (1932) it means the physical plant itself. While street railways are not included in the definition given in sec. 196.01 (1), they are doubtless public utilities in the ordinary sense of the term, and for the purpose of municipal financing were included in the term "public utilities" under sec. 66.06 (9) (b) as it existed in 1931.

The legislature, in providing for various regulatory measures of different classes of public utilities, has used various terms. It has used the term "railroad," as defined in sec. 195.02, in considering regulations which apply only to railroads, and it has used the term "street railways" in ch. 193, Stats., in connection with regulations applying to them. It is clear that the legislature has used the term "public utility" in sec. 196.01, Stats., and the other terms referred to for the sake of convenience without intending in any way to restrict public utilities to the activities mentioned in the definition. Sec. 66.06 (9m) includes, under the term "public utilities," a number of services and activities. It does not mention sewage disposal plants, but neither does it cover water plants or electric light plants because those utilities were provided for under sec. 66.06 (9) and sec. 66.06 (22), Stats. We conclude, as did the legislature in 1933, that the term "public utility," as used in the constitutional amendment of 1932, embraces a sewage disposal system, such as the city of Racine proposes to construct.

The appellant's contention that the amendment to sec. 3, art. XI, state constitution, was not applicable to an extension of an existing sewage system, is not tenable. We have concluded that the term "public utility," as used in said amendment, embraces a sewage disposal system. Having placed

such construction upon the amendment, we accept it as written. It provides:

"Providing, that an indebtedness created for the purpose of purchasing, . . . *extending, adding to,* . . . operating or managing a public utility of a . . . city, and secured solely by the property or income of such public utility, and whereby no municipal liability is created, shall not be considered an indebtedness of such . . . city, and shall not be included in arriving at such five per centum debt limitation."

It would be difficult to reason that the amendment to sec. 3, art. XI, of the constitution is applicable to a sewage system as a whole and to conclude that it did not apply to an extension of an existing sewage system. Any such interpretation would lead to endless confusion. The contention that ch. 133, Laws of 1933, attempted to enlarge the meaning of the term "public utility," is, we think, without force. The legislature having interpreted the amendment as embracing a sewage system within the term "public utility," both chs. 133 and 162, Laws of 1933, provided the method and means to carry out the letter and spirit of the amendment, and, as this court has held, the legislative construction is entitled to great deference. *State ex rel. Pluntz v. Johnson,* 176 Wis. 107, 114, 184 N. W. 683, 186 N. W. 729.

By ch. 162, Laws of 1933, the legislature re-enacted sec. 66.06 (9) of the statutes. It provides that extensions and improvements of municipally-owned public utilities can be financed by mortgage bonds or mortgage certificates pledging the entire property and income of the utility; that the mortgage bonds can be payable over a period of forty years, and that any debt so secured does not constitute an indebtedness under the terms of the constitution. It further provides that these mortgage bonds or mortgage certificates may be issued to provide for "purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility," in the exact

words of the 1932 amendment to sec. 3, art. XI, of the Wisconsin constitution. It is clear that the legislature considered that it was enacting this chapter in conformity with the provisions of the amendment. The purposes for which such financing was to be used were identical with the purposes as set forth in the amendment, and maturities, instead of extending over a period of twenty years, extended over a period of forty years, as the legislature considered the amendment allowed. The legislature provided for pledging both the property and revenues of the entire system in accordance with what it considered the effect of the amendment. The same applies to the legislative action in enacting ch. 133, Laws of 1933, which re-enacted sec. 66.06 (22), Stats., and provided the same methods of financing for sewage disposal systems.

Unless the 1932 amendment to sec. 3, art. XI, has the effect contended for by respondents, sec. 66.06 (9) and sec. 66.06 (22), Stats., as re-enacted in 1933, would be unconstitutional. The rule with reference to deciding a statute to be unconstitutional has been stated many times by this court to be as follows:

Before a statute can be said to be unconstitutional, the statute must lack in public purpose "so clear and palpable as to be perceptible by every mind at the first blush." This was said by Chief Justice DIXON, who sat in the constitutional convention and helped frame the charter of our state. *Brodhead v. Milwaukee,* 19 Wis. *624, *652. "We must bear in mind," said Chief Justice WINSLOW, "the well-established principle that it [the statute] must be sustained unless it be clear beyond reasonable question that it violates some constitutional limitation or prohibition." *Borgnis v. Falk Co.* 147 Wis. 327, 348, 133 N. W. 209. "The rule of all courts," said Mr. Justice BARDEEN, "is that a statute will be declared unconstitutional only when it is shown beyond reasonable doubt that it conflicts with the fundamental law.

It is equally true that the courts will seek every reasonable mode of reconciliation of the statute with the constitution, and it is only when reconciliation has been found impossible that it will be declared void." *State ex rel. Hicks v. Stevens,* 112 Wis. 170, 172, 88 N. W. 48.

In *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 549, 90 N. W. 1098, this court, speaking through Mr. Justice DODGE, said:

"We must and do concede to the legislative branch of the government the fullest exercise of discretion within the realm of reason, and, if a public purpose can be conceived which might rationally be deemed to justify the act, the court cannot further weigh the adequacy of the need or the wisdom of the method."

The courts will presume in favor of the constitutionality of the acts in a case of doubt and sustain them. *State ex rel. Brayton v. Merriman,* 6 Wis. *14; *Smith v. Mariner,* 5 Wis. 551; *In re Oliver,* 17 Wis. *681; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561; *Northwestern National Bank v. Superior,* 103 Wis. 43, 79 N. W. 54; *State ex rel. Carnation M. P. Co. v. Emery,* 178 Wis. 147, 151, 189 N. W. 564. The legislature, subject to the constitutions of the United States and of this state, is supreme in its particular field, and it is well established that this court will not declare laws unconstitutional unless it appears beyond reasonable doubt that they contravene constitutional provisions. *State ex rel. Milwaukee v. Milwaukee E. R. & L. Co.* 144 Wis. 386, 129 N. W. 623; *Lawrence University v. Outagamie County,* 150 Wis. 244, 136 N. W. 619; *Petition of Breidenbach,* 214 Wis. 54, 252 N. W. 366; *Doering v. Swoboda,* 214 Wis. 481, 489, 253 N. W. 657.

Both subs. (9) and (22) of sec. 66.06, Stats., govern the procedure to be followed in borrowing funds as provided for in the agreement between the city of Racine and the government. We hold the enactments valid and that the pledging of the income and property of the entire utility does

not constitute an indebtedness of the city of Racine within the meaning of the constitution as now amended.

The plaintiff also contends that the city of Racine has no authority to divert the $69,000 now on hand from the proceeds of the two former bond issues to the special purpose provided for in the agreement between the city and the government. It appears that said bonds were issued "for the planning, construction and establishment of units of a sewage disposal system." It cannot be said that there is any diversion of the funds. The purpose for which these funds are to be used is the same now as it was when the bonds were issued; namely, the planning, construction, and establishment of units of a sewage disposal system.

We hold that the complaint does not state facts sufficient to constitute a cause of action, and that the demurrer must be sustained.

*By the Court.*—Order affirmed, and record remanded for further proceedings according to law.