2023 WI 36

# Supreme Court of Wisconsin

NOTICE

**This order is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2021AP1343 & 2021AP1382

Jeffrey Becker, Andrea Klein and A Leap Above Dance, LLC,

      Plaintiffs-Appellants,

    v.

Dane County, Janel Heinrich and Public Health of Madison & Dane County,

      Defendants-Respondents.

**FILED**

**May 2, 2023**

Sheila T. Reiff
Clerk of Supreme Court
Madison, WI

---

The Court entered the following order on this date:

¶1 The court having considered plaintiffs-appellants-petitioners Jeffrey Becker, Andrea Klein, and A Leap Above Dance, LLC's motion for reconsideration;

¶2 IT IS ORDERED that the motion for reconsideration is denied without costs.

¶3 BRIAN HAGEDORN, J. *(concurring)*. The motion for reconsideration does not meet our standards; I join the court's order denying it.[1] I write separately to address the petitioners' suggestion that my "text-and-history" approach to the nondelegation challenge in this case was novel, and they should have the opportunity to brief it.

The petitioners challenged a statutory scheme with roots dating back to the first laws enacted after the adoption of the Wisconsin Constitution. Early legislative enactments are obviously relevant to the original understanding of the Wisconsin Constitution.[2] Indeed, scholarship surrounding the nondelegation doctrine looks at precisely this kind of evidence to determine the scope of judicially-enforceable nondelegation principles.[3]

---

[1] The dissent spends many pages in the hopes of relitigating this case, raising arguments new and old. It does not, however, accurately represent the arguments I made in my concurrence in the underlying case. But the nature of this motion does not demand a re-airing of the legal issues; therefore, I will not do so.

[2] See Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶64, 393 Wis. 2d 38, 946 N.W.2d 35 ("Early enactments following the adoption of the constitution are appropriately given special weight . . . because these enactments are likely to reflect the original public meaning of the constitutional text.").

[3] As the movants are no doubt aware, there is a significant scholarly debate over these matters. Some have argued that little historical evidence supports some of the more robust theories of nondelegation. See, e.g., Julian Davis Mortenson & Nicholas Bagley, Delegation at the Founding, 121 Colum. L. Rev. 277 (2021); Nicholas R. Parrillo, A Critical Assessment of the Originalist Case Against Administrative Regulatory Power: New Evidence from the Federal Tax on Private Real Estate in the 1790s, 130 Yale L.J. 1288 (2021); Christine Kexel Chabot, The Lost History of Delegation at the Founding, 56 Ga. L. Rev. 81 (2021). Other scholars have argued that history reflects general agreement about nondelegation

2

It is true that some have attempted to propound a kind of general theory to govern nondelegation challenges. But as I explained in my concurrence, there is no need to resort to a judicially-created all-purpose test if history provides sufficient assistance. Analyzing the historical record to assess how <u>specific</u> nondelegation claims may have been understood should be uncontroversial. This is particularly important here because the dangers of judicial usurpation are great. Justice Scalia has suggested that where possible, the rule of law should be a law of rules.[4] A nondelegation framework that is ill-defined or too abstract runs the risk of operating simply as a means by which judges find whatever they're predisposed to find. If a general framework is appropriate, it should offer reasonable clarity, and always be subject to a case-specific check rooted in an honest, faithful inquiry into the original understanding of the Wisconsin Constitution.

In this case, the petitioners asked us to revise our approach to nondelegation questions, but they did not present an originalist case for their proposed rule rooted in the relevant history. That failure is not a good reason to give them another opportunity to do so now. I respectfully concur.

---

as a principle, even if its precise contours were subject to debate and not particularly consistent. <u>See, e.g.</u>, Ilan Wurman, <u>Nondelegation at the Founding</u>, 130 Yale L.J. 1490 (2021).

[4] <u>See</u> Antonin Scalia, <u>The Rule of Law as a Law of Rules</u>, 56 U. Chi. L. Rev. 1175 (1989).

¶4    REBECCA GRASSL BRADLEY, J.    *(dissenting).*

I like bats much better than bureaucrats. I live in the Managerial Age, in a world of "Admin." The greatest evil is not now done in those sordid "dens of crime" that Dickens loved to paint. . . . [I]t is conceived and ordered (moved, seconded, carried, and minuted) in clean, carpeted, warmed and well-lighted offices, by quiet men with white collars and cut fingernails and smooth-shaven cheeks who do not need to raise their voices. Hence, naturally enough, my symbol for Hell is something like the bureaucracy of a police state or the office of a thoroughly nasty business concern.

C.S. Lewis, Preface to The Screwtape Letters 3-4 (1961) (1942).

¶5    The people of Wisconsin protected themselves from the evils of bureaucracy by ratifying a constitution under which only elected officials, directly accountable to the voters, could prescribe or proscribe the activities of the people. In this case, the four members of the majority effectively amended the constitution to ordain a fourth branch of government, although the people never agreed to be governed by it.[1] The damage done to the constitutional separation of powers is bad enough, but in order to rubber stamp the diktats of the bureaucrats, the majority also bastardized history. The petitioners highlighted the error in their motion for reconsideration, but the majority refuses to admit its mistake, much less correct it. Such acknowledgement may embarrass the majority, but better the majority endure some mortification than the people suffer an affront to their liberty.

¶6    The petitioners argue two grounds for reconsideration. First, the petitioners seek an opportunity to brief Justice Brian

_____

[1] Becker v. Dane County, 2022 WI 63, 403 Wis. 2d 424, 977 N.W.2d 390.

4

K. Hagedorn's novel approach to analyzing the nondelegation doctrine. As the petitioners explain, neither this court nor the United States Supreme Court has ever resolved a nondelegation issue using this method, nor did any member of this court join the concurrence proposing it. While the first basis for reconsideration is grounded in the justices' different philosophical approaches to constitutional law, the second basis for reconsideration highlights a fundamental error contaminating the majority's entire analysis. Although neither party——nor any of the seven amici——even mentioned it, the majority heavily relied on an 1849 statute as supposed historical evidence of the legislature delegating extraordinarily broad rulemaking authority to a single, unelected public-health official. The majority omitted from its analysis the pivotal portion of that statute, under which the legislature purported to delegate the power to promulgate public health orders to elected officials. Nothing in the statute authorized unelected bureaucrats to order the people do anything. As the petitioners point out, the majority was dead wrong.

¶7 While the majority's oversight is troubling, its current obstinacy is unjustifiable. "To err is human, and judges are nothing if not human[.]" Bartlett v. Evers, 2020 WI 68, ¶202, 393 Wis. 2d 172, 945 N.W.2d 685 (Kelly, J., concurring/dissenting); see also State ex rel. Ekern v. Zimmerman, 187 Wis. 180, 196, 204 N.W. 803 (1925) ("Perfection is an attribute solely of the Supreme Ruler of the universe[.]"). The availability of reconsideration represents a judicial recognition of our own fallibility. By

5

rejecting this motion for reconsideration, the majority does "more damage to the rule of law" than by "admit[ting] [its] error[.]" State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 190, 935 N.W.2d 813 (quoting Johnson Controls, Inc. v. Emps. Ins. of Wausau, 2003 WI 108, ¶100, 264 Wis. 2d 60, 665 N.W.2d 257). In doing so, the majority endorses revisionist history, eroding a bedrock on which civilized society rests——truth. I dissent.

## I. THE MAJORITY'S ERROR IN BECKER

The majority's rejection of the nondelegation principle relied heavily on its selective reading of an 1849 statute. That statute's first section stated:

> The justices of the peace of every town, the president and trustees of every incorporated village, and the mayor and aldermen of every incorporated city in this state, shall be boards of health, and as such shall exercise all the powers, and perform all the duties provided in this chapter, within the limits of the towns, villages, and cities respectively, of which they are such officers.

Wis. Rev. Stat. ch. 26, § 1 (1849). Neither the majority/lead opinion[2] nor Justice Hagedorn's concurrence acknowledged this section (i.e., they "overlooked" it), which defined the composition of a local board of health. Critically, all members of such local boards were elected officials, directly accountable to the people. The reasoning of both opinions depends on other sections of the statute, which the majority misconstrued to grant

---

[2] Wis. S. Ct. IOP III.G.4 ("If . . . the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion[.]' ").

unelected local boards significant rulemaking authority.  See infra Parts II, IV.

¶8  Because neither the majority/lead opinion nor the concurrence seemed to notice the first section of the 1849 statute, the majority mistakenly assumed that members of local boards of health were unelected bureaucrats.  Only by ignoring the first section of the 1849 statute could the majority (erroneously) conclude that broad delegations of rulemaking authority to bureaucrats do not offend the Wisconsin Constitution, as originally understood.  The 1849 statute——to the extent it has any relevance——actually stands for the opposite proposition:  the constitution does not permit delegations of legislative authority to unelected bureaucrats.  To the extent the statute delegated any rulemaking authority, duly elected officials were the only permissible delegees.  The statute declared that members of local boards "shall be" elected officials; bureaucrats could not serve on those boards.  See Wis. Rev. Stat. ch. 26, § 1 (1849).

¶9  In section 2, the 1849 statute distinguished between local boards of health and local public health officers, reinforcing that the powers of the two were purposefully kept separate:

> Every board of health may take such measures and make
> such rules and regulations, as they may deem most
> effectual for the preservation of the public health, and
> for that purpose may appoint a physician, who shall be
> the health officer of the territory within the
> jurisdiction of the board, and who shall hold his office
> during their pleasure; they may also appoint so many
> persons to aid them in the execution of their powers and

duties, as they think proper, and shall regulate the fees and charges of every person so employed by them.

Id. § 2. While the 1849 statute may have given rulemaking authority to local boards, it cannot fairly be read to have granted any such authority to health officers, who performed an executive, not legislative, function. The legislature statutorily authorized local boards to "make such rules and regulations, as they may deem most effectual for the preservation of the public health[.]" Id. The legislature did not so authorize health officers. See id. Section 3 permitted local boards—not health officers—to implement orders, and section 4 declared that the local boards—not health officers—had to first publish those orders for them to be enforceable. Id. §§ 3-4. A health officer who tried to make law unilaterally and then enforce it acted without authority. As the petitioners explain in their motion for reconsideration, "this statute['s plain language] does not provide any support whatsoever for the proposition that the power to issue enforceable restrictions can be delegated to a single, unelected official at the local level. If anything, it cuts the other way."

¶10 The majority misunderstood the historical context in which the 1849 statute existed. For decades after the statute's enactment, "local boards of health and appointment of [local public-]health officers were optional." Wis. Legis. Council, Staff Report to the Public Health Committee on Public Health Services 14 (1960). Much to the medical profession's lament, local boards were generally found only in large cities. William C. Rives, The Importance and Essential Needs of Local Boards of

8

Health, 13 JAMA 403, 403 (1889). According to an 1883 report, "in more than one [Wisconsin] town where Small Pox made its appearance it spread solely because there was no one authorized to take the prompt and efficient measures that the emergency demanded[.]" State Bd. of Health, Annual Report of 1882 102 (1883). A similar report a few years later explained:

> Local Boards . . . have long had a legal existence in the State of Wisconsin, certain officials elected for other purposes having by the statutes been declared to be also Boards . . . . As a matter of fact, however, these Boards, though invested with ample powers, have, except in a very few of the larger cities, seldom had more than a nominal existence, have rarely ever met . . . , have more rarely appointed Health Officers, and have practically almost wholly ignored their duties as guardians of Public Health.

State Bd. of Health, Biennial Report for the Period from Nov., 1882 to Sept. 30, 1884 27 (1885). After smallpox devastated Wisconsin in the early 1880s, the legislature responded by enacting a law mandating the formation of local boards. Wis. Legis. Council, Staff Report to the Public Health Committee on Public Health Services, at 14–15.

¶11 The legislative history of the 1883 statute reveals a serious policy concern with unelected bureaucrats serving on local boards of health. The 1882 report contains a copy of the bill as first introduced; it had been prepared by the State Board of Health. The bill stated, in relevant part:

> Section 1. Every town board, village board, or common council of every town, village or city in this state shall hereafter, within thirty days after each annual election, organize themselves into a Board of Health, or shall appoint from their own members or otherwise, a

9

suitable number of competent persons, who shall organize by the election of a chairman and clerk, and exercise all the powers and perform all the duties of a Board of Health in and for such town, village or city:  provided, that no special health department shall have been established or constituted by the charter or other act of incorporation of any such town, village or city.  And every board of health organized, appointed or elected under the provisions of this act . . . .

State Bd. of Health, Annual Report of 1882, at 104 (emphasis added).  Ostensibly, this bill would have authorized bureaucrats to serve on local boards; however, the legislature removed the emphasized language, maintaining the historical requirement that all members of local boards must be elected officials.  See § 1, ch. 167, Laws of 1883.

¶12  The majority's failure to fully consider the 1849 statute is particularly striking given the central role it played in the decision.  Appendix 1 reproduces the instances in which it was cited or discussed.  Also noted are instances in which members of the majority advanced the theory that the 1849 statutes are especially important.  Appendix 1 illustrates the significance of the 1849 statute to the court's decision, especially for Justice Hagedorn——whose vote was necessary to uphold the validity of orders issued by local health officials.  Also evident in Appendix 1, despite extensive discussion of the statute by all members of the majority, none of them mentioned the first section of the statute——only sections 2 through 4.

II.  THE CONCURRENCE'S ANALYTICAL ERRORS

¶13  In his concurring opinion, Justice Hagedorn placed substantial, if not controlling, emphasis on the 1849 statute.  He

wrote, "[t]hese 1849 statutes offer significant evidence of original understanding in this case." Becker v. Dane County, 2022 WI 63, ¶65, 403 Wis. 2d 424, 977 N.W.2d 390 (Hagedorn, J., concurring); see also id., ¶39 (majority/lead op.) ("[T]he original understanding of our constitution's separation of powers was that the constitution allows grants of broad public health authority to local governments substantively similar to that delineated in Wis. Stat. § 252.03."). He continued:

> Our earliest statutes provide particularly important evidence of how the Wisconsin Constitution was originally understood. The Revised Statutes of 1849 were written and adopted by legislators who observed or participated in the constitutional convention first hand. Shortly after it convened, Wisconsin's first state legislature quickly created a commission to assist in drafting our first statutes. The commission's task was to compile and recommend an initial set of laws based upon territorial rules and practice, omitting those that were obsolete, as well as those repugnant to the newly drafted constitution. The commission's recommendations were then debated and voted on by the legislature, ultimately creating the Revised Statutes of 1849.

Id., ¶62 (Hagedorn, J., concurring); see also id., ¶38 (majority/lead op.) ("Bolstering our conclusion that the substantive nature of Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 do not upset our constitutional separation of powers is founding-era grants of similar public health authority to local governments. Wisconsin's first state legislature saw no conflict between the constitution's separation of powers and the grant of broad public health authority to local governments."). For support, Justice Hagedorn cited a secondary source, a book on Wisconsin legal history by Attorney Joseph A. Ranney. In addition

11

to misinterpreting the statute by neglecting to consider its first section, Justice Hagedorn also misunderstood how the revised 1849 statutes were created. Neither primary sources nor Attorney Ranney's findings support Justice Hagedorn's analytical foundation.

¶14 The 1849 Assembly Journal contains a report from the committee on revision, which compiled the revised 1849 statutes. This report chronicles the struggles of the committee, which felt overworked. Expressing concern, it wrote:

> The act authorizing the election of commissioners to revise the laws seems to contemplate that they should suggest in writing, by reports or notes accompanying the acts revised, the contradictions, omissions, or imperfections which might appear therein, and the mode in which the same might be reconciled, supplied, or amended, and their reasons for advising the repeal of any act which in their judgment ought to be repealed.—With this provision the commissioners have been wholly unable to comply. It must be obvious that the performance of such a labor would consume much time[.]

J. 2d Sess. Assemb. State Wis. 788-89 (1849) (emphasis added). The early legislature was similarly overworked, so it generally deferred to the committee. See Joseph A. Ranney, Trusting Nothing to Providence: A History of Wisconsin's Legal System 76 (1999) ("[T]he commissioners were a legislature unto themselves: their revisions to the laws were subject to legislative approval but ultimately were adopted largely intact."); W. Scott Van Alstyne, Jr., Land Transfer and Recording in Wisconsin: A Partial History——Part I, 1955 Wis. L. Rev. 44, 54 (explaining the committee's drafts "met some opposition" but that "a comparison of the legislative result with the final drafts confirms the notations in

12

[a committee member]'s diary that the drafts finally passed with amazingly few amendments of any significance").

¶15 Attorney Ranney, on the same page Justice Hagedorn cited, explained:

> The commissioners met in the late summer of 1848 and soon realized that the task was too big for them alone. The 1839 codification of territorial laws eased their task somewhat, but the large body of laws enacted since 1839 had to be compiled and organized. In addition, existing statutes failed to cover many important areas of the law and filling in the gaps was a huge task.

> The commissioners decided to concentrate first on laws essential to the basic administration of the state. By January of 1849, they had prepared code sections covering the organization of state and local government, taxes, transportation, public health, corporations, and trade and commercial regulation. The 1849 legislature adopted these laws largely without change and appointed a special legislative committee to help the commissioners with their remaining work.

Ranney, Trusting Nothing to Providence, at 76. The 1849 statute was based primarily on a territorial law (under a system of government with a different separation of powers) and appears to have been adopted by the legislature prior to the formation of the special legislative committee, which was created to assist the committee on revision. See Wis. Stats. p. 125 (1839). Attorney Ranney's work is hardly an endorsement of using the revised 1849 statutes as a guidepost to constructing the Wisconsin Constitution's original meaning.

¶16 Justice Hagedorn also erred by failing to consider other sources of original meaning. "We may look to 'three primary sources in determining the meaning of a constitution provision:

13

[1] the plain meaning, [2] the constitutional debates and practices of the time, and [3] the earliest interpretations of the provision by the legislature, as manifested through the first legislative action following adoption.' " Black v. City of Milwaukee, 2016 WI 47, ¶54, 369 Wis. 2d 272, 882 N.W.2d 333 (Rebecca Grassl Bradley, J., concurring) (quoting Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶19, 295 Wis. 2d 1, 719 N.W.2d 408 (modifications in the original)). "The ordering of these sources reflect[s] their legal weight, i.e., plain meaning is most important while early statutory enactments are least indicative." Becker, 403 Wis. 2d 424, ¶105 n.18 (Rebecca Grassl Bradley, J., dissenting) (citation omitted). Justice Hagedorn barely considered plain meaning or the constitutional debates, focusing almost exclusively on an early statutory enactment while ignoring the very statutory provision that undercuts the majority's analysis altogether.

### III.  RECONSIDERATION STANDARDS

¶17  To the extent this court reflexively denies this (or any other) reconsideration motion based on its nonbinding internal operating procedures (IOPs), the court errs. Wisconsin Stat. § (Rule) 809.64 (2019–20) states, "[a] party may seek reconsideration of the judgment or opinion of the supreme court by filing a motion under s. 809.14 for reconsideration within 20 days after the date of the decision of the supreme court." No rule of appellate procedure specifies the criteria this court should consider when determining whether to grant a motion for reconsideration. This court's IOPs provide some guidance. Part III, Section J notes, in relevant part:

14

> Reconsideration, in the sense of a rehearing of the case, is seldom granted. A change of decision on reconsideration will ensue only when the court has overlooked controlling legal precedent or important policy considerations or has overlooked or misconstrued a controlling or significant fact appearing in the record. A motion for reconsideration may result in the court's issuing a corrective or explanatory memorandum to its opinion without changing the mandate.

Wis. S. Ct. IOP III.J. This statement, however, is not controlling. The introduction to the IOPs notes the IOPs "are not rules of appellate procedure." Id. at Intro. The introduction also declares, "[i]t should be reemphasized that these are not rules. They do not purport to limit or describe in binding fashion the powers or duties of any Supreme Court personnel." Id. (emphasis added). The IOPs do not contemplate a majority of the court committing a serious error of the sort permeating its analysis in this case, and the non-exhaustive examples of grounds for reconsideration contained in non-binding IOPs do not constrain the court from correcting its mistakes. Declaring that "policy considerations" warrant reconsideration, but grievous errors in pronouncing the law do not, would be an extraordinary position indeed for the state's highest court to take. "The court should have the courage to correct its own mistakes. The motion for reconsideration affords the court this opportunity." Collison v. City of Milwaukee Bd. of Rev., No. 2018AP669, unpublished order, at 5 (Aug. 16, 2021) (Roggensack, J., dissenting from the denial of the motion for reconsideration).

15

IV. THE MAJORITY'S FOUNDATIONAL ERRORS COMPEL RECONSIDERATION

¶18 The majority's misapplication of the 1849 statute overlooked the text's dispositive distinction between elected officials and unelected bureaucrats, an axiom of early Wisconsin government. To reject the distinction is to equate a technocracy with a democratic republic. "What is a republican government? There is or can be but one answer to the question. It is a state in which the exercise of the sovereign power is lodged in representatives elected by the people." J. B. Jillson, An Abolitionist Subscriber's Views (1847), reprinted in The Struggle over Ratification, at 639, 640 (Milo M. Quaife ed., Wis. Hist. Soc'y 1920); see also Gundy v. United States, 588 U.S. __, 139 S. Ct. 2116, 2134 (2019) (Gorsuch, J., dissenting) ("Restricting the task of legislating to one branch characterized by difficult and deliberative processes was also designed to promote fair notice and the rule of law, ensuring the people would be subject to a relatively stable and predictable set of rules. And by directing that legislating be done only by elected representatives in a public process, the Constitution sought to ensure that the lines of accountability would be clear: The sovereign people would know, without ambiguity, whom to hold accountable for the laws they would have to follow."). Indirect accountability (i.e., a bureaucrat's accountability to elected officials who are in turn accountable to the people) is no substitute for direct accountability. See Clean Wis., Inc. v. Wis. Dep't of Nat. Res., 2021 WI 72, ¶56, 398 Wis. 2d 433, 961 N.W.2d 611 (Rebecca Grassl Bradley, J., dissenting) ("The people never imparted any power on

16

administrative bureaucrats insulated from any democratic oversight by the people.").

¶19 The nondelegation principle is firmly rooted in Wisconsin's history as well as the structure of the constitution. "The people have a right to expect and demand at the hands of their representatives a full and fair discharge of their duties. Elected by their votes for the attainment of specified and well-known objects, their powers are limited and they are acting in the capacity of agents and cannot transcend instructions." Selections from the Milwaukee Courier: Views of a "Democrat" (1846), reprinted in The Struggle over Ratification, at 196, 196 (Milo M. Quaife ed., Wis. Hist. Soc'y 1920). The very process by which bureaucrats make decisions is distinct from the approach of elected officials (at least those who would like to continue serving). "A 'technocratic' approach to government 'drains public discourse of substantive moral argument and treats ideologically contestable questions as if they were matters of economic efficiency, the province of experts.' " Becker, 403 Wis. 2d 424, ¶147 (quoting Michael J. Sandel, The Tyranny of Merit: What's Become of the Common Good 20 (2020)).

¶20 This distinction is ingrained in the Wisconsin Constitution, and early pronouncements of the nondelegation principle exist in this court's precedent. Well over a century ago, this court unequivocally stated that "the power to make the law cannot be delegated to any board or body not directly responsible to the people." State ex rel. Adams v. Burdge, 95 Wis. 390, 404, 70 N.W. 347 (1897) (emphasis added). The

17

majority/lead opinion in Becker never addressed Burdge, and Justice Hagedorn stated in his concurrence that "Burdge supports the conclusion that the authority to issue local health orders may be conferred by the legislature on local health official," exhibiting his failure to apprehend the distinction between elected officials and unelected bureaucrats. See Becker, 403 Wis. 2d 424, ¶66 (Hagedorn, J., concurring).

¶21 More recently, in a case analogous to Becker, the court thrice noted that Secretary-Designee Andrea Palm was an unelected bureaucrat in its majority opinion striking down her safer-at-home order as an unlawful exercise of power. Wisconsin Legislature v. Palm, 2020 WI 42, ¶1, 391 Wis. 2d 497, 942 N.W.2d 900 ("This case is about the assertion of power by one unelected official, Andrea Palm, and her order to all people within Wisconsin to remain in their homes, not to travel and to close all businesses that she declares are not 'essential' in Emergency Order 28."); id., ¶24 ("If we were to read the definition of 'Rule' as Palm suggests, one person, Palm, an unelected official, could create law applicable to all people during the course of COVID-19 and subject people to imprisonment when they disobeyed her order."); id., ¶28 ("Rulemaking exists precisely to ensure that kind of controlling, subjective judgment asserted by one unelected official, Palm, is not imposed in Wisconsin." (citation omitted)). My concurrence in that case expounded upon this distinction: "As a general principle, it is the duty of the legislature to create the law, and any delegation of lawmaking responsibility to administrative agencies . . . must be carefully circumscribed in order to avoid

18

the people being governed by unelected bureaucrats." Id., ¶78 (Rebecca Grassl Bradley, J., concurring); see also Tavern League of Wis., Inc. v. Palm, 2021 WI 33, ¶17, 396 Wis. 2d 434, 957 N.W.2d 261 (lead op.) ("Rulemaking 'ensure[s] that . . . controlling, subjective judgment asserted by one unelected official' is not imposed by agencies through the abandonment of rulemaking procedures." (quoting Palm, 391 Wis. 2d 497, ¶28 (majority op.) (modifications in the original))); Gymfinity, Ltd. v. Dane County, No. 2020AP1927-OA, unpublished order, at 3 (Wis. Dec. 21, 2020) (Roggensack, C.J., dissenting) ("[W]hen it is presented to us that fundamental personal liberty is suppressed by an unelected official, we must act."). The majority in Becker never addressed Palm; not a single member of the majority in this case joined the majority in Palm, and three of them dissented from it. E.g., Becker, 403 Wis. 2d 424, ¶136 (Rebecca Grassl Bradley, J., dissenting) ("The majority silently overrules Palm, a decision from which three members of the majority in this case sharply dissented. Only a change in court membership enables the current majority to discard this quite recent precedent.").

¶22 To the extent the 1849 statute has relevance, it lends historical credence to the dissent I authored in Becker. See, e.g., id., ¶74 ("Under our state constitution, the people of Wisconsin authorized particular elected officials to exercise power over them. But the people never consented to that power being given away."); id., ¶75 ("Not surprisingly, when the people consented to the rules that will govern society, they carefully

19

confined the exercise of such awesome power to those whom they elect. Should others attempt to rule over the people, their actions are beyond the law, even if they bear the imprimatur of a legislative body. Legislators have no power to anoint legislators; only the people do."); id., ¶76 ("The people adopted an exception permitting the legislature to delegate lawmaking power to county boards (the members of which are elected), but those local governmental entities may not give the power to anyone else."); id., ¶77 ("The constitution does not give the Dane County Board of Supervisors any authority to empower a single, unelected bureaucrat to restrict the liberty of the people of Dane County."); id., ¶108 ("Burdge goes on to explain the authority the legislature may confer on local boards (not unelected bureaucrats)[.]"); id., ¶128 ("If the lawmakers may not re-delegate their delegated power even to the people, it is logically impossible for county boards to redelegate their delegated power to an unelected bureaucrat."); id., ¶133 ("This duty becomes imperative when governmental actors conspire to collapse the carefully calibrated separation of powers among the three branches in favor of consolidating power in a single, unelected bureaucrat."); id., ¶147 ("The majority displaces the constitutional design for the exercise of lawmaking power with a 'technocracy' the majority favors." (citation omitted)). Substantial precedent reinforces the difference between the constitutional exercise of power by elected officials and the unlawful exercise of power by unelected bureaucrats. See id., ¶¶118-32 (summarizing many cases).

20

¶23 The majority owns its error; neither the parties nor any of the seven amici briefed the statutory history on which the majority relied. Some members of the majority have warned us of the detrimental consequences of violating the party presentation principle. See, e.g., Town of Wilson v. City of Sheboygan, 2020 WI 16, ¶78, 390 Wis. 2d 266, 938 N.W.2d 493 (Hagedorn, J., concurring) ("I believe we would be best served by adversarial briefing and argument. A full hearing on the merits of this important issue would help ensure that we are not missing anything and that the consequences of our decision are fully fleshed out beforehand."). The consequences in this case are particularly grave because the majority tampered with the very constitutional structure of the government. When judges conduct independent historical research without the benefit of adversarial briefing, they have an obligation to use the sources they find "faithfully," which necessarily requires judges to thoroughly review them. Skylar Reese Croy & Alexander Lemke, An Unnatural Reading: The Revisionist History of Abortion in Hodes v. Schmidt, 32 U. Fla. J. L. & Pub. Pol'y 71, 81 (2021). Citing historical sources out of context is antithetical to the originalist approach. Id.

¶24 The denial of the motion for reconsideration demonstrates at least some members of the majority never cared about a legitimate historical inquiry into the meaning of the Wisconsin Constitution. Justice Hagedorn claimed in his concurrence that "[r]egardless of judicial philosophy, every member of this court is interested in . . . what the historical evidence reveals about the text." Becker, 403 Wis. 2d 424, ¶72

21

(Hagedorn, J., concurring). If that were true, the majority would correct its blatant error.

V. CONCLUSION

¶25 "This Court is forever adding new stories to the temples of constitutional law, and the temples have a way of collapsing when one story too many is added." Douglas v. City of Jeannette, 319 U.S. 157, 181 (1943) (Jackson, J., separate op.). In Becker, the majority added a fictional story to the already disintegrating temple of the nondelegation principle. The majority is happy with the result its story produced, so it denies this motion for reconsideration without explanation. The majority's errors injure the constitutional separation of powers as well as this court's reputation. Although the oversight in Becker may have been an honest mistake, today's denial is not. I dissent.[3]

---

[3] The majority/lead opinion and the concurrence are replete with other examples of poor statutory history analysis. As just one example, the majority/lead opinion truncated a quote from a 1919 enactment. Below is the full section of the statute quoted in paragraph 17 of the majority/lead opinion, with strikethrough indicating the portions omitted from the quote:

> ~~SECTION 1. There is added to the statutes a new section to read: Section 1411-5.~~ The local board of health ~~of each township, incorporated village or city with the consent of the state board of health~~ shall have power to establish quarantine and to order and execute what is reasonable and necessary for the prevention and suppression of disease; to forbid public gatherings when deemed necessary to control epidemics~~, and to condemn and abate conditions causative of disease by means of rules and regulations which shall be consistent with the state law and the rules and regulations prescribed by the state board of health~~.

§ 1, ch. 159, Laws of 1919. The struck-through portions of the statute indicate local boards of health could issue orders only

22

¶26 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.

Appendix 1: Instances in Which the Majority/Lead Opinion or the Concurrence Cited or Discussed the 1849 Statute

| Paragraph/Footnote | Reference |
|---|---|
| Majority/lead op., ¶16[4] | ¶16 Similarly, Wisconsin's first state legislature granted the local power to "take" measures "deem[ed] most effectual for the preservation of the public health." Importantly, this law distinguished the power to "take such measures" for the preservation of public health from the power to "make such rules and regulations" for the same purpose. See Wis. Stat. ch. 26, § 2 (1849). That distinction indicates that "take such measures" included action not by rule or regulation but by order, as subsequent sections of that same law recognized. See Wis. Stat. ch. 26, §§ 3-4 (1849) (differentiating between an "order" and a "regulation"). |

---

with the express approval of the state board of health, which would seem to be a significant procedural safeguard. The petitioners referenced the struck-through language in their reply brief, and they complain in their motion for reconsideration that the majority overlooked this language. See Pet'rs Reply Br. at 6 ("Respondents cite a statute . . . which, they claim, gave local health officers 'the power to order and execute what is reasonable and necessary for the prevention and suppression of disease.' . . . The law they cite, however, applied to 'local board[s] of health'——not individual health officers——and any 'orders' required the 'consent of the state board of health.' ").

[4] This paragraph was joined by four justices.

23

| Majority/lead op., ¶38 | ¶38 Bolstering our conclusion that the substantive nature of Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 do not upset our constitutional separation of powers is founding-era grants of similar public health authority to local governments. Wisconsin's first state legislature saw no conflict between the constitution's separation of powers and the grant of broad public health authority to local governments. The first state code enacted just months after our constitution's ratification authorized local boards of health the authority to "take such measures, and make such rules and regulations, as they may deem most effectual for the preservation of the public health." Wis. Stat. ch. 26, § 2 (1849). A violation of board of health "order or regulation" constituted a criminal misdemeanor punishable by up to $100 (over $3,000 in 2022 dollars) or three months in prison. Wis. Stat. ch. 26, § 3 (1849). |
|---|---|
| Majority/lead op., ¶39 | ¶39 We see two upshots from this original grant of public health authority to local governments. First, the original understanding of our constitution's separation of powers was that the constitution allows grants of broad public health authority to local governments substantively similar to that delineated in Wis. Stat. § 252.03. And second, our constitution's separation of powers also allows public health orders enforceable by criminal penalties that far exceed the civil citations authorized by Dane County Ordinance § 46.40. As such, Wis. Stat. § 252.03 and Dane County Ordinance § 46.40 do not substantively offend our constitution's separation of powers. |

24

| Concurrence, ¶62 | ¶62 Our earliest statutes provide particularly important evidence of how the Wisconsin Constitution was originally understood. The Revised Statutes of 1849 were written and adopted by legislators who observed or participated in the constitutional convention first hand. Shortly after it convened, Wisconsin's first state legislature quickly created a commission to assist in drafting our first statutes. The commission's task was to compile and recommend an initial set of laws based upon territorial rules and practice, omitting those that were obsolete, as well as those repugnant to the newly drafted constitution. The commission's recommendations were then debated and voted on by the legislature, ultimately creating the Revised Statutes of 1849. |
|---|---|
| Concurrence, ¶63 | ¶63 These laws therefore have unique relevance to an analysis focused on the original understanding of the constitutional text. This is particularly true when we find laws on the books today that either descended from these early statutes or do similar things. When the constitutionality of such a law is challenged, the historical context provided by those early laws must weigh heavily in the analysis. Does this mean these 1849 laws represent the final word on a statute's constitutionality? No. But unquestionably, they provide very strong evidence of the constitution's original understanding. |
| Concurrence, ¶63 n.35 | State v. Beno, 116 Wis. 2d 122, 138, 341 N.W.2d 668 (1984) ("[B]ecause the Revised Statutes of 1849 are the first of our statutes to be enacted following the constitution, it is reasonable to rely on those statutes as reflecting the practice when the constitution was adopted to assist our interpretation of a word used by the authors of the constitution in 1848." (quoting another source)). |
| Concurrence, ¶63 n.36 | We have long employed this interpretive technique in constitution interpretation. See State ex rel. Pluntz v. Johnson, 176 |

| | |
|---|---|
| | Wis. 107, 114–15, 186 N.W. 729 (1922) (noting that a statute "first appeared in the . . . Revised Statutes of 1849" and concluding that it "amounts to contemporaneous legislative construction of this constitutional provision, which construction is entitled to great deference"); Payne v. City of Racine, 217 Wis. 550, 558, 259 N.W. 437 (1935) (same); Buse v. Smith, 74 Wis. 2d 550, 572, 247 N.W.2d 141 (1976) (noting the persuasive force of "the contemporaneous construction evidenced" a provision of the "Revised statutes of 1849"). |
| Concurrence, ¶64 | ¶64 One such 1849 statute is especially on-point in this case.  Chapter 26 in the Revised Statutes of 1849 was entitled "Of the Preservation of the Public Health."  That statute is significant for our purposes because it established local boards of health and gave them duties and responsibilities quite similar to the statutes challenged in this case.  In relevant part, the statute provided:  "Every board of health may take such measures, and make such rules and regulations, as they may deem most effectual for the preservation of the public health."  It then provided that "every person who shall violate any order or regulation, made by any board of health . . . shall be deemed guilty of a misdemeanor, and punished by a fine not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months."  In other words, not only did Wisconsin's first state government authorize local health authorities to issue orders, it criminalized the failure to follow those orders. |
| Concurrence, ¶64 n.37 | Wis. Stat. ch. 26 (1849). |
| Concurrence, ¶64 n.38 | Wis. Stat. ch. 26 (1849). |
| Concurrence, ¶64 n.39 | Wis. Stat. ch. 26, § 2 (1849). |
| Concurrence, ¶64 n.40 | Wis. Stat. ch. 26, § 3 (1849). |

| Concurrence, ¶65 | ¶65 These 1849 statutes offer significant evidence of original understanding in this case. When the Wisconsin Constitution was ratified, those participating in state government did not appear to understand the constitution to forbid giving local officials charged with protecting public health the authority to issue at least some orders of indeterminate character. Nor was it understood to be problematic if those orders were enforceable. That same general statutory authority has been amended and modified many times, but it continues in today's Wis. Stat. § 252.03. If this arrangement on its face did not run afoul of the constitutional separation of powers in 1849, it is hard to see why it would today. Whatever theoretical nondelegation framework may be found in the Wisconsin Constitution, this kind of empowerment of local health officials does not appear to violate it. |
|---|---|
| Concurrence, ¶65 n.41 | See Wis. Stat. ch. 26, §§ 2, 3 (1849); Wis. Stat. ch. 32 §§ 2, 3 (1858); Wis. Stat. ch. 57, §§ 1412, 1413 (1878); Wis. Stat. ch. 76e § 1412 (1921); Wis. Stat. § 143.03 (1923-24); Wis. Stat. § 252.03 (1993-94). |
| Concurrence, ¶71 (third sentence) | Based on the historical record, I conclude the legislature did not impermissibly delegate legislative power to local health officers by authorizing them to issue orders under Wis. Stat. § 252.03. |
| Concurrence, ¶72 | ¶72 I close with a word to litigants. Regardless of judicial philosophy, every member of this court is interested in what the text says and what the historical evidence reveals about the text. Therefore, parties who come to us advancing legal theories grounded in the Wisconsin Constitution should make every effort to present arguments focused on the original understanding of our constitution. While such briefing is always welcome, arguments of this type are especially helpful when analyzing novel claims or considering challenges to our precedent. This is not a new invitation; it is made in earnest. |

27